**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick (#004738)
J. James Christian (#023614)
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016
Telephone: (602) 255-6000
rgh@tblaw.com; jjc@tblaw.com

**DIETRICH SIBEN THORPE LLP**
Matthew P. Siben
500 Australian Ave. South, Suite 637
West Palm Beach, Florida 33401
Telephone: (561) 820-4882
matthew@dstlegal.com

Counsel for Plaintiffs

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Maverick Fund, L.D.C.; Maverick Fund USA, Ltd.; Maverick Fund II, Ltd.; Maverick Neutral Fund, Ltd.; Maverick Neutral Levered Fund, Ltd.; Maverick Long Fund, Ltd.; and Maverick Long Enhanced Fund, Ltd., <br><br> Plaintiffs, <br> vs. <br><br> First Solar, Inc.; Michael J. Ahearn; Robert J. Gillette; Mark R. Widmar; Jens Meyerhoff; James Zhu; Bruce Sohn; and David Eaglesham, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS AND STATE LAW** <br><br> DEMAND FOR JURY TRIAL |

# Table of Contents

I.      SUMMARY OF THE ACTION ........................................................................1

II.     JURISDICTION AND VENUE..................................................................3

III.    THE PARTIES ........................................................................................4

IV.     DEFENDANTS' FRAUDULENT SCHEME ...........................................7

    A.    First Solar's Business ....................................................................7

    B.    Defendants Concealed the Existence and Severity of Known Defects in First Solar's Panels and Manufacturing Process Resulting in Hundreds of Millions of Dollars in Losses .................................7

    C.    Defendants Misrepresented Panel Degradation Rates and Concealed Heat-Related Problems with First Solar's Modules/Systems that Substantially Increased Costs ..............13

    D.    Defendants Manipulated First Solar's Published Cost Per Watt Metric Reported to Investors.................................21

    E.    Defendants Concealed Massive Cost Overruns at its Utility Projects, and Misrepresented the Value of First Solar's Project Pipeline and the Company's Ability to Convert the Pipeline Into Earnings ................23

    F.    Defendants Falsely Described First Solar as Close to Reaching Grid Parity ...............25

    G.    Defendants Knew There Would be an Oversupply of Cheap Panels in the Market, but Refused to Adjust Earnings Forecasts Accordingly ................30

    H.    Defendants Issued False Financials and Violated GAAP ......................32

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................33

    A.    Defendants' False and Misleading Statements Prior to Fall 2010 ...........35

    B.    Defendants' False and Misleading Statements From October 2010 Through December 14, 2011.....................36

VI.     RELIANCE ............................................................................60

VII.    LOSS CAUSATION ..............................................................63

VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR......................70

IX.     DEFENDANTS' FRAUDULENT SCHEME ENCOMPASSED CONDUCT MORE THAN MERE MISREPRESENTATIONS AND OMISSIONS ................71

X.      CAUSES OF ACTION .................................................................72

i

XI.    PRAYER FOR RELIEF ................................................................80

XII.   JURY TRIAL DEMAND ...........................................................80

Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. (hereafter referred to collectively as "Maverick" or "Plaintiffs") make the following allegations based on the investigation conducted by Plaintiffs' Counsel, including, but not limited to, a review and analysis of First Solar, Inc.'s ("First Solar" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); media and securities analysts' reports about the Company; analyst conference calls; court filings in the action styled *Mark Smilovits v. First Solar, Inc., et al.*, 2:12-cv-00555 (D. Ariz.) (the "Class Action"); discussions with percipient witnesses who previously worked for First Solar, as detailed herein; review and analysis of internal First Solar documents; consultations with experts; and the review and analysis of other matters of public record.  While Plaintiffs have reviewed, and may reference or utilize these materials, Plaintiffs do not adopt any exculpatory language contained in these materials.

## I.     SUMMARY OF THE ACTION

1.     Plaintiffs purchased First Solar common stock during the period from May 2011 through December 2011, at times when the price of the shares was artificially inflated by Defendants' fraudulent scheme.[1]

2.     Since its inception as a public company, First Solar had a grand plan to produce electricity from the sun at costs comparable to conventional electricity production methods – otherwise known as grid parity.   Grid parity is widely recognized as the proverbial "Holy Grail" of solar electricity production.   As Defendants and investors recognized, First Solar would unlock enormous demand for solar panels worldwide by achieving grid parity and, if this could be done without slashing First Solar's margins, the Company's earnings would skyrocket.

---

[1] References to "Defendants" generally refers to First Solar, Michael J. Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James Zhu, Bruce Sohn, and David Eaglesham.

3.    In June 2009, Defendants took First Solar's plan to achieve grid parity public.  In a 117-slide presentation (attached hereto as Ex. A), Defendants detailed the metrics explaining how First Solar would achieve this momentous goal, *and do so very profitably* at very healthy gross and operating margins as set forth in ¶¶103-104.  First Solar's plan to achieve grid parity would come to be known as the "roadmap."

4.    By late 2010 and throughout 2011, Defendants were repeatedly reassuring investors First Solar was "on track" to achieve grid parity or "doing better than that roadmap."  By August 2011, First Solar's Chief Executive Officer ("CEO") Robert J. Gillette claimed:  "Our LCOE is approaching grid parity, which should drive elasticity and demand and a growth of sustainable markets."[2]  Defendants' public enthusiasm for reaching grid parity was clear, and without reservation.

5.    Plaintiffs and other investors believed Defendants.  The truth was far different.  Throughout 2011, First Solar was a Company hiding massive problems.  First Solar's manufacturing process had known issues that created defective panels, ultimately costing the Company over $200 million in warranty replacement costs.  *See* §IV.B.  First Solar's panels degraded far faster than First Solar's warranties stipulated, especially in hot climates where the Company built solar farms.   *See* §IV.C.  Defendants also claimed First Solar could build panels at an ever-decreasing cost per watt, and that First Solar could install those panels efficiently and within budget.  In truth, First Solar manipulated its published cost per watt metric, and First Solar's utility-scale projects were suffering from massive cost overruns.  *See* §§IV.D and E.

6.    As a result of the undisclosed problems then-existing at First Solar, the Company was nowhere near achieving grid parity or the goals set forth in the "roadmap."  Internally, First Solar employees knew the Company's public statements

---

[2] LCOE, or the Levelized Cost of Energy, is an economic assessment of the cost of an energy-generating system including all the costs over its lifetime, including initial investment, operations and maintenance, cost of fuel, and cost of capital.  LCOE is used to compare the costs of generating electricity from different sources.

weren't tethered to reality. As one former First Solar employee put it: "The CEO was telling us we were getting to grid parity, we weren't telling him." Or as another former First Solar employee phrased it: "[Grid parity] was just so far off. [First Solar] had too far to go. . . . They would have had to dramatically lower costs."

7. By the end of 2011, the problems at First Solar had grown far too large to conceal further. The Company was forced to take a massive $215 million warranty reserve for defective solar panels. High rates of panel degradation eroded margins, as did rampant cost overruns. Though Defendants had claimed high visibility to achieving operating income of $875 to $975 million for 2011, the Company would ultimately suffer a net *loss* of $39 million in 2011. Moreover, Defendants were forced to admit that First Solar was not close to achieving grid parity and that the only way First Solar could come close to achieving grid parity would be to slash the Company's margins.

8. Plaintiffs purchased First Solar common stock in 2011 while its price was artificially inflated as a result of the fraud. Upon disclosure of the truth concerning Defendants' statements, Plaintiffs were injured when First Solar's stock price declined precipitously. Plaintiffs bring this action to recover investment losses caused by Defendants' fraudulent conduct.

## II.   JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337, and 1367. The Court has personal jurisdiction over Defendants as all Defendants are residents of the United States and/or have minimum contacts with this District.

10. Venue is proper in this District pursuant to §27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa, and 28 U.S.C. §§1391 (b) and (c).

11. First Solar transacts business in this District. Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this

District.

12.     In connection with the acts and omissions alleged herein, all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.    THE PARTIES**

**Plaintiffs**

13.     Non-party Maverick Capital, Ltd. is a registered investment manager managing private investment funds exclusively for qualified investors.  The firm was founded in 1993 by, among others, Lee S. Ainslie III.  Maverick Capital, Ltd. has offices in Dallas, Texas and New York, New York.  Maverick Capital, Ltd. is the investment manager on behalf of Plaintiffs.

14.     Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. are private investment funds managed by non-party Maverick Capital, Ltd.  Maverick Capital, Ltd., as the money manager for Plaintiffs, had total investment discretion for Plaintiffs' investments.  Maverick Capital, Ltd. maintains an office in New York, New York and Plaintiffs' investment decisions were directed, controlled, and coordinated in New York.  Further, Plaintiffs suffered losses resulting from Defendants' fraud in New York.

15.     Plaintiffs and Maverick Capital, Ltd., as the investment manager for Plaintiffs, read and relied upon certain of Defendants' false and misleading statements alleged herein, as set forth in greater detail below.  In reliance on Defendants' material misrepresentations and omissions, as described below, Plaintiffs purchased First Solar common stock and suffered substantial losses caused by Defendants' wrongful conduct.

16.     Plaintiffs purchased millions of First Solar common shares during the

4

period between May 4, 2011 and December 15, 2011, while First Solar stock traded at artificially inflated prices. Plaintiffs held substantial First Solar shares through disclosures of the truth concerning, and the materialization of risks concealed by, Defendants' fraudulent scheme. Plaintiffs' purchases and sales of First Solar stock are set forth in Plaintiffs' trade data provided to Defendants by e-mail dated June 25, 2014. Plaintiffs' trade data is incorporated by reference herein, which Plaintiffs will submit to the Court under seal upon request.

**Defendants**

17. Defendant First Solar is engaged in the manufacture and sale of solar modules with an advanced thin film semiconductor technology, and it designs, constructs and sells photovoltaic ("PV") solar power systems.

18. Defendant Michael J. Ahearn ("Ahearn") founded First Solar. Defendant Ahearn is, and at all relevant times was, the Company's Chairman of the Board of Directors. On October 25, 2011, defendant Ahearn was appointed Interim CEO of the Company. In 2010 and 2011, Ahearn sold 2,989,016 shares of his First Solar stock at artificially inflated prices for $350,029,187.

19. Defendant Robert J. Gillette ("Gillette") was, until his resignation on October 25, 2011, the Company's CEO.

20. Defendant Mark R. Widmar ("Widmar") served as the Company's Chief Financial Officer ("CFO") from April 2011 through the remainder of the relevant period into 2012. He has significant accounting experience, and was at all relevant times a Certified Public Accountant.

21. Defendant Jens Meyerhoff ("Meyerhoff") was, until December 2010, the Company's CFO and served as President of the Utility Systems Business Group until August 17, 2011. In 2010 and 2011, Meyerhoff sold 91,750 shares of his First Solar stock at artificially inflated prices for $12,692,282. Meyerhoff was instrumental in creating the Company's Grid Parity Roadmap.

22. Defendant James Zhu ("Zhu") was, until January 2012, the Company's

5

Chief Accounting Officer.  From January 2011 through March 2011, Zhu served as the interim CFO and from June 2007 through October 2009, Zhu served as the Company's Vice President and Corporate Controller.  In 2010 and 2011, Zhu sold 7,384 shares of his First Solar stock at artificially inflated prices for $1,109,855.

23.    Defendant Bruce Sohn ("Sohn") was, until April 30, 2011, the Company's President of Operations. In 2010 and 2011, Sohn sold 62,000 shares of his First Solar stock at artificially inflated prices for $8,832,347.  According to Credit Suisse's analyst covering First Solar, Sohn "was a key architect behind the [C]ompany's technology roadmap."

24.    Defendant David Eaglesham ("Eaglesham") was the Chief Technology Officer at First Solar from November 2009 to May 2012.  From June 2006 to November 2009, Defendant Eaglesham was the Company's Vice President of Technology.  In 2010 and 2011, Eaglesham sold 69,983 shares of his First Solar stock at artificially inflated prices for $9,645,826.

25.    Defendants Ahearn, Gillette, Widmar, Meyerhoff, Zhu, Sohn and Eaglesham are collectively referred to herein as the "Individual Defendants."

26.    During the relevant period, the Individual Defendants, as senior executive officers of First Solar, were privy to confidential and proprietary information concerning First Solar, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning First Solar, as discussed in detail below. Because of their positions with First Solar, the Individual Defendants had access to non-public information about First Solar's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or

recklessly disregarded that the adverse facts specified herein had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

**IV.    DEFENDANTS' FRAUDULENT SCHEME**

    **A.    First Solar's Business**

    27.    During the relevant period, according to First Solar:  "We manufacture and sell solar modules with an advanced thin-film semiconductor technology, and we design, construct, and sell photovoltaic (PV) solar power systems."

    28.    As set forth in First Solar's 2010 Form 10-K, as filed with the SEC on February 28, 2011:

> We are one of the world's largest PV solar module manufacturers and produced nearly 1.4 gigawatts (GW) of solar modules in 2010.  We are the world's largest thin-film PV solar module manufacturer.  We manufacture our solar modules on high-throughput production lines and perform all manufacturing steps ourselves in an automated, proprietary, and continuous process. Our solar modules employ a thin layer of semiconductor material to convert sunlight into electricity.  Our manufacturing process eliminates the multiple supply chain operators and expensive and time consuming batch processing steps that are used to produce a crystalline silicon solar module.  Currently, we manufacture our solar modules at our Perrysburg, Ohio, Frankfurt/Oder, Germany, and Kulim, Malaysia manufacturing facilities (with additional manufacturing facilities under construction or planned for construction in Kulim, Malaysia, Frankfurt/Oder, Germany, Blanquefort, France, Vietnam, and the United States), and we conduct our research and development activities primarily at our Perrysburg, Ohio manufacturing facility.

    **B.    Defendants Concealed the Existence and Severity of Known Defects in First Solar's Panels and Manufacturing Process Resulting in Hundreds of Millions of Dollars in Losses**

    29.    On July 29, 2010, First Solar admitted for the first time it had had a "manufacturing excursion" that could impact certain of its panels:

> During the period from June of 2008 to June of 2009, a manufacturing excursion occurred, affecting less than 4% of the total product manufacturer within the period.  The excursion could result in possible premature power loss in affected modules.

> The root cause was identified and subsequently mitigated in June of 2009.  Ongoing testing confirms the corrective actions are effective.  We've been working directly with impacted customers to replace the affected modules and these efforts are well underway, and in some cases, complete.

30.     Defendants assured investors they understood the problems with the manufacturing processes and estimated the expense of remedying the problems at $23.4 million.

31.     As detailed herein, throughout the rest of 2010 and 2011, Defendants repeatedly reassured investors that the Company had adequate reserves for defective panels, that the manufacturing excursion was limited, and repeatedly emphasized First Solar's manufacturing process and panels were reliable and of the highest quality. Defendants also repeatedly and falsely stated the Company had taken corrective actions and was nearly finished with remediation of defective panels.

32.     In truth, as Defendants knew, First Solar suffered from numerous manufacturing problems, the "manufacturing excursion" and other known defects impacted far more panels than Defendants reported to the public, and manufacturing defects would cost far more to remediate than Defendants had told the public.  Indeed, by the end of 2011, the remediation costs connected to defects from manufacturing problems had risen to $215.7 million – far in excess of Defendants' false and misleading statement in July 2010 that the cost of fixing the defective panels was only $23.4 million. First Solar's panels were plagued with defects.

33.     According to Confidential Witness ("CW") 1, who worked as Global Supplier Quality Engineer at First Solar's Perrysburg, Ohio facility from 2008 through January 2013, the Company went to great lengths to keep known defects in the Company's panels from being revealed to the public.  CW1 personally witnessed many problems with the Company's panels, all of which he was specifically told had to be kept confidential.

34.     CW1 witnessed many defects with the Company's panels/modules, including the following: (i) modules were regularly failing throughout CW1's employment from 2008 through 2013, due to extreme heat that melted module parts; (ii) a significant percentage of panels at the Company's Alamosa, Colorado site were breaking and cracking due to (it was thought) fluctuating temperatures; and (iii)

problems with seal failures (the Solar Edge Tape, or SET) that failed to protect the modules' internal parts from weather, and was an ongoing problem that "a lot of people were concerned about."

35.     During internal meetings and phone conferences, First Solar's quality management team specifically told CW1 and other quality engineers that they were not to talk about the Company's problems with panels (or other defects) with anyone, either in the Company or outside the Company.  "They were very aware of this type of info getting around and becoming more public knowledge."

36.     CW1 believed the Company demanded that employees, such as CW1, keep information concerning defects confidential because, if that information were public, it would be detrimental to the Company's stock price and consumers would lose confidence in the Company's products.  Furthermore, CW1 witnessed a "big disconnect between what [executive management was] saying and what was actually happening in the Company."

37.     According to CW2, the Individual Defendants were personally and regularly involved in the Company's struggles to deal with defects.  CW2 worked for First Solar as an engineer and then as an Operations and Maintenance Global Manager, Operations Technology from 2008 to June 2012.  CW2's job was to monitor and maintain the functionality of First Solar's solar farms.

38.     According to CW2, any problems with modules were a major concern at the Company.  When defective panels were found, reports were generated and anything significant reported up the chain of command to Gillette, Ahearn and Sohn. According to CW2, within this environment, where the Company was closely monitoring any problems experienced by the modules, CW2 "could not conceivably imagine that the people at the top were not aware [of any defects in panels.]"

39.     For example, CW2 described a problem with the Solar Edge Tape, or SET, breaking down in the field and allowing rain and moisture inside the module, which damaged the electrical wiring inside.  According to CW2, this became an "all

hands on deck" effort to figure out how to deal with the problem – with reports being provided up the chain to Ahearn and Gillette.

40.     CW3, a quality technician at First Solar's Perrysburg plant from 2007 to 2011, witnessed the machinery at the Perrysburg plant frequently malfunctioning and producing modules with obvious defects.  However, the manufacturing line was rarely stopped even when there was an obvious problem, and defective modules were shipped to customers.

41.     CW3 stood at different stations along the manufacturing line and watched for defective modules to be pulled off the line and scrapped (*i.e.*, thrown away).  For instance, CW3 witnessed that many modules going through the oven at the plant came out covered in "spurs," manmade growths on the glass.  This required operators and quality technicians to pull all of the modules off the line and scrap them.  CW3 recalled in 2009 that plant operators scrapped thousands of modules coming out of the oven covered in spurs.  They stacked the bad modules on a buck, which held about a 120 modules each.  CW3 recalled filling 12 to 15 bucks of defective modules on particular days.

42.     CW3 recalled that after the oven problems in 2009, the Company had a lot of modules scrapped due to the glass spurs.  When these modules were scrapped, they were flagged with an orange-colored scrap sticker.  Rather than throw away the defective panels, however, First Solar decided to ship them to customers anyway.

43.     According to CW3, First Solar frequently changed the criteria employees used to determine which modules needed to be scrapped due to manufacturing defects. The changes allowed the Company to salvage more defective modules and ship them out to customers, as employees were told they were scrapping too many modules.

44.     In late 2009 or early 2010, employees were instructed to take the bucks loaded with the defective modules with glass spurs, use a razor blade to pull off the orange sticker and load the modules back onto the manufacturing line so they could be finished and shipped out to customers.  CW3 witnessed the same process performed on

modules with other types of defects that prior to the new, less stringent criteria would have been scrapped.

45.     CW4, a production operator at First Solar's Perrysburg plant from 2008 to October 2012, also detailed machinery breakdowns and that defective panels were shipped to customers. CW4 worked the 12-hour night shifts at the plant and reported directly to a team leader, also called a Master Manufacturing Associate.  CW4 and the team leader also reported to a supervisor for each shift.

46.     According to CW4, before each shift employees attended a meeting during which the supervisor discussed the production quota for the day's shift and provided information about whether the group had met its quota for the previous shift. Every shift had quotas for module production.  The shift also aimed to stay below quota caps set for "scrapped" modules.  In addition, production operators were given handbooks that very specifically detailed which defects seen on a module required it to be scrapped. The criteria for determining which modules to scrap changed regularly, sometimes every other month, according to CW4 and corroborated by CW3.  New handbooks with the new criteria were given out to employees at the pre-shift meetings, but eventually the Company stopped giving out the handbooks and told employees to check the Company computer system for the latest criteria before scrapping a module. According to CW4, the criteria changes tended to allow more and more modules to avoid being scrapped.  "What was once bad, two weeks later was suddenly good," and "it seemed like they were trying to pass more stuff," according to CW4.

47.     CW4 also recalled First Solar's Perrysburg plant had an excessive amount of problems with its machinery, that "none of the machines worked right," and that the machines "were always breaking down, every day.  Sometimes 10 times a day."  CW4's supervisors were aware of the problems with the machinery, especially when it shut down the manufacturing line for long periods of time, throwing the shift's production numbers off.  According to CW4, everyone on the manufacturing floor, including the supervisor could see a large screen in the plant that showed ongoing

11

production numbers and scrapped numbers in almost real time, and machinery problems were also recorded in the Company computer system. If the line went down, a supervisor would be able to see the numbers falling off by looking at the screen.

48. According to CW4, when production operators saw a defective module that met Company criteria requiring it to be scrapped as defective, the operator would remove it from the line, flag it with an orange sticker and place it in "quarantine." Later in the shift, the supervisor or quality control personnel would inspect the scrapped modules to determine if indeed they needed to be scrapped. CW4 witnessed that supervisors regularly ignored defects and returned defective modules to the manufacturing line and the modules were shipped out to customers in order to keep the scrap count as low as possible. CW4 said this practice of putting scrapped modules back into the line seemed to happen more often when the shift was about to hit its quota cap for scrapped modules. CW4 referred to this as "staying in the green," meaning the shift stayed within its quota numbers, which would be marked in the color green on the shift report.

49. Additionally, CW4 stated that whenever a production operator removed a module from the line for quarantine, the operator was required to enter the module's bar code and other pertinent information about the defect into the Company computer system. This system was used to print reports and was accessible to management to review shift numbers.

50. Consistent with the reports of the Confidential Witnesses interviewed by Plaintiffs' Counsel, Lead Plaintiff in the Class Action pleaded:

> According to CW-2, a Process Development Engineer in First Solar's Perrysburg, Ohio facility, First Solar "knew in 2007 that the projected failure rate [of the Series II Modules] was going to be greater than 4%." CW-2's tests showed a much shorter life expectancy over the lifetime of some of the panels. Modeling by First Solar employees in the Root Cause Analysis Department confirmed CW-2's test results. CW-2 presented his/her findings in numerous meetings throughout 2007 and 2008, in which s/he predicted a 12% to 14% failure rate on the solar panels. CW-2 said that Greg Helyer (Director of Process Development Engineering), Kuntal Kumar (Manager of Process Development) and other process development engineers attended these meetings. CW-2 said

that Mike Koralewski (Vice President of Global Quality) was "informed in private meetings" of CW-2's projected failure rates.  According to CW-2, "Helyer told me to ignore the results of my own life-term test results and presentation."  When First Solar announced in mid-2010 that it was anticipating a 4% failure rate of the panels, CW-2 believed that "the number was made up."  According to CW-2, the engineering staff laughed when they saw that announcement: "We knew it [the failure rate] was underestimated."

51.    On information and belief, and consistent with Plaintiffs' Counsel's investigation, the allegations attributed to CW-2 in the Class Action have an adequate basis, and evidence supporting these allegations is in the possession of others, including Defendants.

**C.    Defendants Misrepresented Panel Degradation Rates and Concealed Heat-Related Problems with First Solar's Modules/Systems that Substantially Increased Costs**

52.    First Solar's financial performance in 2011 was substantially impaired because the Company was dealing with undisclosed high degradation rates and heat-related problems with panels/modules.

53.    First Solar's publicly reported poor economic performance in the fourth quarter of 2011 was caused, in part, by problems with the performance of First Solar's modules in hotter climates.   Heat-related problems were a big deal.   As Eric Rosenbaum wrote for *The Street* on February 29, 2012:

> Imagine a company that has predicated its future on building out large-scale projects in desert conditions.  Now imagine the technology the company uses doesn't have a long-term track record of performing under intense heat.
>
> You don't have to imagine the company.  It's First Solar (FSLR), and based on the revelation in its Tuesday conference call with analysts that high-temperature degradation issues have surfaced with its panels, it's the most alarming prospect for a company in the midst of a critical strategic transition.

54.    Though Defendants only first admitted in February 2012 that its modules were having problems performing in high-heat environments, these problems had been impacting the Company's panels *and inverters* for years.  These problems had been directly impacting the Company's ability to build profitable solar plants in the American Southwest – where many of the Company's projects in its pipeline were

13

located.   Moreover, Defendants were keenly aware of these issues, but failed to disclose them to investors.

55.     Numerous former First Solar employees acknowledged the Company, and the Individual Defendants, knew about the heat-related problems plaguing First Solar's modules.   According to CW2, Defendants Ahearn, Gillette, Meyerhoff, Zhu and Widmar were personally and regularly involved in the Company's struggles to deal with heat-related problems at the El Dorado plant for 12-18 months after the plant was brought on line in 2009.   CW2 worked for First Solar as an engineer and then as an Operations and Maintenance Global Manager, Operations Technology from 2008 to June 2012.   CW2's job was to monitor and maintain the functionality of First Solar's solar farms.   This included monitoring and analyzing the solar farms' energy output – including El Dorado.

56.     According to CW2, the El Dorado plant was a big deal for First Solar.   It was the Company's first time constructing a major solar power plant.   Sempra purchased El Dorado, and Sempra had the potential to be an important customer for First Solar.   "It was make or break for the company."   According to CW2, First Solar needed to prove it could build a large system that would work as promised.   If it failed, the whole push into building systems would be in jeopardy.   "So at the time, it was literally the most important thing to the company."   "It was verbalized internally quite clearly that the most important thing was to make sure Sempra was happy."

57.     Sempra was not happy with El Dorado.   According to CW2, El Dorado did not produce the level of megawatts First Solar had told Sempra it would produce. CW2 knew this, because he personally monitored El Dorado's output.   Defendants knew there were production problems at El Dorado.   Gillette personally was involved in negotiations with Sempra's CEO to assure Sempra the problem would be fixed, and Meyerhoff, Zhu and Widmar also played a role in these discussions, which took place through at least April 2011.

58.     After 18 months of investigations, the problem was finally traced to the

14

inverters, which transform the DC energy from the modules to AC power for the electrical grid.  According to CW2, the inverters were shutting off in extreme heat to protect themselves from overheating.  When they shut off, the power output at the farm shrank.  Ultimately, First Solar was forced to construct an expansion of El Dorado, adding another megawatt of capacity at no extra cost to Sempra.

59.    CW2 listened in to the quarterly report calls with the investing public, and recognized that Defendants did not disclose the heat-related problems at El Dorado to investors.

60.    Like CW2, CW5 also witnessed First Solar's difficulties dealing with heat-related problems in 2009-2011.  And, like CW2, CW5 knew these problems were reported to First Solar's senior management.  CW5 worked as a development engineer who compiled data from First Solar's solar farms from May 2009 through March 2011, at a facility near the Perrysburg manufacturing plant.  CW5 was a contract employee. CW5's job was to collect all data that streamed from the Company's solar farms, which included energy output, weather conditions and down time.  S/He put the data into First Solar's computer system, which s/he referred to as the database warehouse. The information was accessible to other employees of the Company as needed.

61.    According to CW5, First Solar's solar power farms were plagued with low energy output problems that caused the farms to fail to meet promised wattage commitments from 2009 until he stopped working for First Solar in 2011.  "We were saying that we would output this much energy out, but we were never meeting our goals.  We weren't even close."

62.    According to CW5, a major problem throughout his/her time at First Solar, was that First Solar's panels did not perform well in high heat.  For example, the plant outside Las Vegas frequently was 50% below what it was supposed to produce. According to CW5, a lot of modules were breaking, failing and melting due to the temperatures.  According to CW5, "It was just too hot."

63.    Defendants knew the Company's solar farms were underperforming in

15

high-heat at least as early as September 2010, according to CW5.   The underperformance was so dramatic that it was hard for First Solar executives to believe.   Indeed, in September 2010, CW5 flew to the Company headquarters to present a report and demonstration of data collection from the solar farms to prove his/her numbers were accurate.   CW5's numbers were accurate.   First Solar's solar farms were regularly underperforming by a large margin.

64.   According to CW5, First Solar's high-level executives asked for the meeting because they were concerned about the unexpectedly low output numbers, and they wanted to be sure the data was correct before blaming the modules themselves. CW5 was required to prove that the testing equipment was accurately assessing the energy output at the farms and that the data collection system was accurately collecting the information from the testing equipment.

65.   CW5 sat in the Company's Network Operations Center (NOC) room, which had several large screens showing data from the different solar farms, and showed executives that his/her data was correct.   CW5 said the meetings lasted for a week and included John Schroeder, Global Director of Information Technology.   CW5 also believed First Solar's Gillette was paying attention to this meeting.   After this meeting, there was no way that First Solar could be ignorant of the energy production shortfalls at First Solar's farms.

66.   CW6 worked as a senior planner and did project management in First Solar's Engineering, Procurement and Construction Department ("EPC") from December 2011 to June 2013.   CW6 worked at First Solar's corporate headquarters in Tempe, Arizona.   Among other things, CW6 dealt with insurance for the plant, scheduling and planning construction of the plant, module allocation for the plant, any problems that arose, site constraints, lien waivers and making sure everything stayed on schedule.   According to CW6, First Solar's modules degraded very fast, much faster than other modules in the market, and this was known internally at First Solar prior to 2010.

67.     According to CW6, First Solar's solar panel modules degraded "way faster than what it should" and "much faster" than other modules on the market.  "Our modules were not anywhere close" to the quality of other modules on the market.  The degradation had been going on for some time at large power plants, and was well know within the Company, according to CW6.

68.     Further, according to CW6, First Solar's modules degraded so fast that standard energy inverters on the market would not work on them.  Inverters, which convert solar power into usable household energy, typically require that the module maintain a certain level of energy output or the inverter will shut off.  When the energy output on First Solar's modules degraded so drastically so fast, their energy output would fall below the functional range of standard inverters and the inverter would shut off, ceasing to convert any energy from the module.

69.     To deal with the problem, according to CW6, First Solar had to custom order inverters from GE, Power One and other manufacturers.  The custom inverters were designed to work at lower wattage levels so when the modules degraded, the inverters would continue to function.  Each custom designed inverter cost $25,000 to $40,000 more than a standard inverter cost.  Because some plants required many inverters (250 or more), the use of such inverters "jacked up our costs."  Other solar panel modules on the market did not have this problem, and would "never go out of range" or cause the inverter to shut down.

70.     CW7 corroborates CW6's account concerning the expense of solving degradation issues with the use of inverters.  CW7 was a Cost Estimator in the EPC Performance Optimization unit of First Solar from November 2010 to August 2013. Throughout 2011, CW7 worked closely with First Solar's Senior Finance Manager, Steve Ryan, on cost overrun issues.  According to CW7, he learned of heat degradation issues with First Solar panels in early 2011.  First Solar had to use inverters to fix the problem.  According to CW7, the inverters were expensive:  "It was huge money." Contemporaneous internal First Solar documents support CW7's account.

71.     CW8 was Operations Manager, EPC Commissioning and Warranty, at First Solar from April 2011 to July 2013.  CW8 oversaw the commissioning and warranties of First Solar's power plants.  Once the site was built, his/her team ensured all the different components were working correctly after it was turned on and before it was turned over to the customer who had purchased the power plant.

72.     According to CW8, First Solar senior executives, who received regular reports about the problems from CW8's department, were aware by the third quarter of 2011 ("3Q2011") that First Solar's solar panels were underperforming.  There were at least two issues.  First Solar was aware no later than 3Q2011 that high temperatures caused accelerated degradation.  Further, performance engineers had also identified by 3Q2011 that panels were damaged by "open circuit conditions" after leaving the manufacturing plants and prior to when they were plugged into the electrical grid system.  According to CW8, even though these problems were known internally by (at the latest) 3Q2011, the Company did not discuss them publicly.  Indeed, the Company knew that the market and consumers were keenly concerned about any heat degradation or performance issues such that when the Company did replace customers' panels it was careful to avoid these terms.  According to CW8:  "It [the warranty program] wasn't even done under the auspices of degradation.  I assure you they did not use the term degradation or lack of performance."

73.     Building out First Solar's Antelope Valley Solar Ranch ("AVSR") was plagued by delays caused, at least in part, by Los Angeles County inspectors' concerns about heat-related problems with First Solar's panels and connections between the panels and the electrical grid, according to CW9.

74.     CW9 was a construction worker and installer on AVSR from October 2011 through April 2012.  CW9 spoke with a Los Angeles County inspector, who indicated to CW9 that Los Angeles County was aware that First Solar's panels were having problems in high-heat environments.  Los Angeles County knew this from problems that had occurred at a different First Solar farm – that is, the heat problems

18

were an ongoing problem pre-dating the issues at AVSR.  According to CW9, as told to him by the inspector, the connection between the panels and the electrical grid would overheat and melt, causing the panels to fail.  As a result, inspectors held up building at AVSR because Los Angeles County wanted First Solar to prove that the panels would not overheat and fail.

75.    CW10 was a project development engineer for First Solar from October 2011 to May 2012.  CW10's job was to scout new locations for potential utility scale projects and conduct initial assessments and cost estimates of the sites.  CW10 was privy to internal First Solar data about the rate of degradation of First Solar's solar panels.  That internal data showed a steeper rate of decline for the panels than what First Solar originally predicted and what First Solar told its customers.

76.    According to CW10, First Solar was not providing the actual rate of decline to customers:  "They weren't telling the client the rate of degradation."  First Solar didn't want to reveal to customers that the modules experienced a steeper rate of degradation during initial use because the Company claimed to have a better module product that experienced less degradation than other panels on the market.

77.    CW10 believed the Company was "setting itself up for failure" by not telling the truth to customers.  According to CW10, when clients did learn about the higher degradation rates, "they came back and wanted to get money back."

78.    CW11 was a project manager in the EPC division at First Solar from April 2011 to April 2012.  CW11 managed three different projects at First Solar, Antelope Valley, Alpine and Roadrunner.  According to CW11, First Solar had serious problems with panel degradation caused by high temperatures.

79.    Within the first month of his/her employment in April 2011, CW11 learned First Solar's panels had a problem with heat degradation.  According to CW11, the problem existed before he/she began at First Solar and First Solar was trying to hide the heat degradation problems from the public.  Moreover, because First Solar didn't know exactly how bad the heat degradation would be, the Company hoped it

would go unnoticed by customers.  As CW11 explained it, First Solar "swept [the problem of degradation] under the rug so their clients wouldn't find out about it.  They were kind of taking a gamble on how much the degradation would be."

80.    To deal with the degradation, according to CW11, First Solar was forced to construct additional rows or sections of solar panels at its solar farms.  For example, the Company might have a module labeled as an 85-watt module.  But in the design, engineers would assume that the module was actually only going to produce 80 watts due to degradation, and they would design for construction needs based on that lower amount.  "Yet they were still marketing them as 85 watts," he said. "They did not tell clients about it. Eventually that surfaced, but it took awhile."  These additional rows of solar panels could be problematic, according to CW11, who remembers that at one facility near Tucson, Arizona, it was difficult to fit the extra panels on site due to space limitations.

81.    CW11 also confirmed the report of CW8 concerning "open circuit conditions."  Panels were damaged by "open circuit conditions" after leaving the manufacturing plants and prior to when they were plugged into the electrical grid system, causing substantial degradation.  According to CW11, this was a problem the Company knew about at least as early as April 2011.  First Solar was forced to plug the panels into "capacitor banks" so electricity could flow through the panels prior to them being plugged into the grid.  But this fix was expensive, and had not been factored into project costs at the time First Solar bid on the projects.  These costs could not be passed along to the customer, and, moreover, First Solar didn't want to admit to customers that this problem existed.

82.    CW12 was an IT Infrastructure Project Manager at First Solar from June 2011 to June 2012.  CW12 reported to Andrew Troiani, Senior Project Manager.  According to CW12, First Solar's panels lost 20 to 30% of their efficiency in the first year of operation.  This degradation was higher than the Company expected.  To compensate for the loss, First Solar began to overbuild its solar farm sites to ensure

that the site could produce the contracted amount of wattage the Company promised to the buyer.

**D.     Defendants Manipulated First Solar's Published Cost Per Watt Metric Reported to Investors**

83.     Throughout its existence, First Solar has repeatedly emphasized the importance of its cost per watt metric.  Reducing the Company's cost per watt lowered overall costs of producing electricity from solar energy and brought the Company closer to being able to create electricity at "grid parity" – a critical point of inflection for the Company as defined in §IV.F.  Further, as Defendants repeatedly told investors, First Solar's purportedly low cost per watt manufacturing and technology was "significantly less than those of traditional crystalline silicon solar module manufacturers" and enabled First Solar to "maintain our cost advantage over traditional crystalline silicon solar module manufacturers."

84.     However, Defendants manipulated First Solar's publicly reported cost per watt figure.

85.     CW13 was the Director of Internal Audit from 2006 through 2010.  CW13 reported directly to Defendant Meyerhoff.  CW13 was responsible for reviewing and acting on internal whistleblower complaints.  CW13 is CW-6 in the Class Action.  CW13 substantially confirmed to Plaintiffs' Counsel's investigator the account attributed to CW-6 in the Class Action.

86.     In either January or February 2010, one of CW13's direct reports received a non-anonymous whistleblower complaint stating that the Vice President of Financial Planning and Analysis, Kurt Wood, had indicated to a group of his subordinates what the publicly reported cost per watt number was and directed attendees of the meeting, including the whistleblower, to do what was necessary to come up with that number.  It was reported to CW13 that Wood used the phrase at the meeting "let's make this happen."  According to the whistleblower, Wood instructed the team to "do whatever you had to do with your charts to make the numbers work."

21

It was reported to CW13 that the whistleblower was knowledgeable about Wood's instructions regarding manipulating the cost per watt numbers because the whistleblower "was in the meeting" with Wood when he gave the directive and was a member of Wood's team.

87.     CW13's direct report told CW13 of the whistleblower complaint, but did not disclose the identity of the whistleblower.  CW13 notified defendant Meyerhoff and met with him to discuss the whistleblower complaint.  CW13 also discussed the situation with First Solar's legal counsel, John Gaffney.  According to CW13, First Solar opened up an investigation into the whistleblower complaint.  CW13 said he/she was "very involved in the beginning" of the investigation, but not in the latter part of the investigation.  Ultimately, First Solar took virtually no action in response to the whistleblower's complaint, merely warning Wood to be careful as to what he said at meetings.

88.     Shortly after the whistleblower complaint concerning manipulation of First Solar's reported cost per watt metric, CW13 was forced to leave First Solar. According to CW13, he/she was terminated because he/she raised concerns about unusual changes made to First Solar's internal auditing processes in 2009.  CW13 believed these changes compromised the integrity of First Solar's controls.

89.     Plaintiffs believe other witnesses have material information concerning First Solar's manipulation of cost per watt figures.  However, these witnesses are unwilling to discuss such matters because they signed confidentiality agreements with First Solar.  In particular, Plaintiffs' Counsel has sent a letter to Georgette Gillen, the former First Solar employee responsible for calculating the cost per watt numbers First Solar reported to investors.  Ms. Gillen, according to an affidavit she signed and submitted to the Court in the Class Action, believes she knows information relevant to these proceedings.  However, because she entered into a non-disclosure agreement, she "feel[s] constrained from speaking about this information."

**E.      Defendants Concealed Massive Cost Overruns at its Utility Projects, and Misrepresented the Value of First Solar's Project Pipeline and the Company's Ability to Convert the Pipeline Into Earnings**

90.     First Solar suffered substantial cost overruns on the solar farms it was building during the relevant period as a result of, among other things, the defects in First Solar's panels, high degradation rates, Defendants' inability to produce panels at the cost-per-watt publicly stated, and other factors detailed herein.  Because of these cost overruns, First Solar was unable to fulfill its contractual obligations to build out the project pipeline as profitably as Defendants had led the market to believe.

91.     By no later than the end of 2010, according to CW7, First Solar was investigating significant cost overruns in the production of its solar farms.  CW7 was a Cost Estimator in the EPC Performance Optimization unit of First Solar from November 2010 to August 2013.  Throughout 2011, CW7 worked closely with First Solar's Senior Finance Manager, Steve Ryan, on cost overrun issues.  Ryan was intimately aware of the serious cost overruns at the Company, and Ryan reported directly to First Solar's CEO Gillette.

92.     In 2010, CW7 was asked to investigate the difference between original estimates and final forecasts for costs of building three projects, Cimarron, Copper Mountain and Sombra.  The final cost forecasts were much higher than the original estimates.  For Cimarron, the final costs were 45.33% higher than the original cost estimate.  For Copper Mountain, it was 21.23% higher.  And, for Sombra, it was 21% higher.  According to CW7, the report was shared with "everybody" at First Solar's EPC division, including Mike Belikoss, VP of EPC Performance Optimization; Jim Tyler, VP of EPC Project management; and Jim Lamon, EVP of the EPC division.  CW7 believes the report was also shared with the CEO and CFO of the Company at the time.

93.     According to CW7, in 2011, First Solar bid for projects based on the aggregate of costs taken from First Solar's pre-determined cost matrix outlined in the

Continued Cost Reduction Roadmap (the "CCRR") that set out the costs for each and every different component of constructing a solar farm. Each year the costs were expected to (per the CCRR) come down. But this was only wishful thinking, according to CW7. Regardless, within First Solar the CCRR was "like the Bible." It had to be followed – even when the CCRRs were inaccurate (as indicated by the cost overruns at Copper Mountain, Cimarron, and Sombra). Notably, First Solar's senior management, including Defendants, approved the CCRRs.

94.    In theory, First Solar could earn a nice profit (20% margins) if it could build solar farms at costs outlined in the CCRRs. In truth, First Solar could not. According to CW7, many of First Solar's projects being built in 2011 were coming in over budget and this substantially ate into profits. According to CW7, s/he and his/her colleagues working on cost estimates and bid numbers were instructed to build in a 20% profit margin into the total cost of each project. But even at 20%, the cost overruns at the projects regularly cut deeply into those profits, so much so First Solar was "lucky to get 10%" profit margins. According to CW7, cost overruns were due to, among other things, excessive site expenses, high labor costs, and different divisions of the Company demanding more money for their piece in the project than the CCRR's pre-set costs.

95.    According to CW7, and as set forth in an internal First Solar analysis dated September 26, 2011, Copper Mountain suffered from substantial cost overruns. For example, non-standard costs were originally budgeted at 2 cents per watt; but actual costs were 18 cents per watt. This was a big deal. First Solar originally bid on Copper Mountain assuming a profit of 16 cents per watt; cost overruns cut profit margin significantly.

96.    According to CW7, First Solar's CEOs knew about the cost overruns throughout 2011. Jim Lamon, EVP of the EPC division, regularly argued with the CEO about the costs of projects because the actual numbers were not coming in as set in the CCRRs. Further, according to CW7, Lamon reviewed every project estimate.

Lamon reported each estimate to the CEO.  Lamon also had to report to the CEO that the Company was not able to get its costs down.  According to CW7, "[Lamon] would go up to whoever the CEO was, and say, we're running into problems at building it at a lower rate."  "Everybody knew it.  There was just no consensus on how to get down to a lower price."

97.    According to CW7, though the cost overruns were widely known within the Company in 2011, the "cost overruns in the field were not public knowledge."  "We were told not to share that info with anyone outside the Company.  Anything we knew we had cost issues with that was not public knowledge. We weren't supposed to be telling anyone."

98.    According to CW14, in the fourth quarter of 2011, defective panels caused First Solar to suffer substantial setbacks in its building of Agua Caliente.  CW14 was a Commodity Manager in First Solar's EPC division from November 2011 to April 2013.

99.    According to CW14, the Agua Caliente project was delayed for a few months in the fourth quarter of 2011 due to solar panel defects.  The project came under intense scrutiny by state and/or county inspectors and construction was consequently shut down.

100.    In an effort to meet revenue projections, CW14's boss, Mark Zeni, and his boss, Jim Lamon, the Senior VP of the EPC division, instructed CW14 to divert all supplies and installations en route to the Agua Caliente site and send them instead to another project nearby.  This was a major problem for the Company.  Making use of the installation items for Agua Caliente required "a lot of reconfiguration" and modification so that it would work at the second site.

**F.    Defendants Falsely Described First Solar as Close to Reaching Grid Parity**

101.    Prior to the relevant period, throughout 2007-2009, First Solar laid out a detailed plan to achieve "grid parity" – the point at which solar electricity became cost

competitive with conventional methods of producing electricity without government subsidies. Grid parity was the proverbial "Holy Grail" for the solar electricity industry. Throughout 2007-2009, First Solar claimed it could reach grid parity – and do so while retaining its historically healthy operating margins. At grid parity, First Solar's volume of sales would explode and, with the Company's traditional profit margins, profits would soar.

102. For instance, in May 2009, First Solar's Walter A. Wohlmuth published and presented a paper detailing the Company's plan to reach grid parity:

> First Solar is targeting cost-parity with fossil-fuel electricity in the 2010–2012 timeframe assuming levelized cost of electricity (LCOE) between $0.08-$0.10/kWh for conventional electricity. **This translates into turnkey system cost of approximately $2.00-$2.50/Watt** as shown in Figure 1. As the system cost comes down so does the LCOE. Power purchase agreements (PPA) with Federal investment tax credit (ITC) and optimized capital bring the costs down further enabling grid parity to be reached sooner at a higher system cost point.
>
> * * *
>
> First Solar's engineering, procurement and construction (EPC) division functions as a contractor for developing utility power plants. This division works on reducing the balance of system (BOS) costs, which excludes the module costs, and can be broken down into inverter components, mechanical installation, electrical installation, project costs, and overhead. First Solar's BOS target is $1.00/Watt and coupled with continued reduction in module costs through increased module efficiency, increased throughput, reduced spending, increased plant scale, and low cost locations enables the system cost to be below the target of $2.00/Watt in 2012.

Thin Film CdTe Module Manufacturing, Walter A. Wholmuth.[3]

103. Similarly, at First Solar's Annual Analyst/Investor Meeting for 2009, at the Westin Las Vegas on June 24, 2009, Ahearn, Sohn, Eaglesham, Meyerhoff, and Polizzotto, **using over 117 slides**, detailed the Company's roadmap to grid parity. Among other things, First Solar would (i) reduce module costs from $0.93 per watt to $0.56-$0.63 per watt; and (ii) reduce its balance of system (or "BOS") from $1.40 per watt to $0.91-$0.98 per watt. Ex. A at slides 61, 65. This would enable First Solar to

---

[3] All emphasis is added unless otherwise noted.

sell solar farms priced with a turnkey system cost of between $2.00 and $2.50 per watt; and, those solar farms would be able to produce electricity at $0.10-$0.15 kWh.  Ex. A at slide 81.   Doing so would drive nearly exponential growth in demand for First Solar's panels.  Ex. A at slide 26.  By reaching grid parity, First Solar would enjoy the benefits of massive demand for its product but yet still maintain very healthy 35-40% gross margins and operating margins of 20-25%.   Ex. A at slides 116-117.  These numbers, as reported to investors at various times, constituted First Solar's "Grid Parity Roadmap."

104.    According to the Grid Parity Roadmap, First Solar's solar farms would cost First Solar $1.47 to $1.61 per watt to make.  First Solar would be able to sell those same solar farms for a system cost of $2.00 to $2.50 per watt – earning a huge margin on each watt of electrical production capacity built and sold.

105.    It is hard to overstate the significance of reaching grid parity.  Not only would First Solar earn a huge margin on the solar farms it built, the market for such solar farms would be (as a practical matter) nearly unlimited once First Solar achieved grid parity.

106.    Put simply, reaching grid parity would unlock a financial bonanza for First Solar.

107.    With Defendants' prior statements about grid parity – including the Grid Parity Roadmap – as a background, beginning in late 2010 and throughout 2011, Defendants repeatedly made false and misleading statements about First Solar actually achieving grid parity.  Beginning no later than December 2010, Defendants stopped talking about grid parity as a mere future event, and began indicating to investors that First Solar was then already very close to grid parity.  *See* §V.B., *infra* (detailing Defendants' false and misleading statements).

108.  For example, at JPMorgan's Technology, Media and Telecom Conference on May 17, 2011, First Solar's Vice President, Investor Relations Larry Polizzotto, told investors that First Solar was close to achieving the goals set forth in

the Grid Parity Roadmap.  According to Polizzotto, First Solar had driven down the cost of modules from $2.49 to $0.75 per watt – only $0.12 from the upper end of First Solar's Grid Parity Roadmap goal.  With respect to BOS costs, Polizzotto said: "About 2 years ago, we said that was $1.40.  Our roadmap is to get that down to the mid $0.90 range.  *We are very close to that at this point*."  Polizzotto would conclude by saying:

> I think at this point we believe that *we're doing better than that roadmap* [*i.e.*, the Grid Parity Roadmap], so there's potentially some opportunity on that.  We haven't updated our roadmap because *we're fairly close to our 2014 goal* on that.
>
> So those things together are what you need in order to get to that $0.10 level.  So, I think *we feel pretty good about our cost roadmap*.

109.    Similarly, on August 4, 2011, Defendant Gillette said:  "*Our LCOE is approaching grid parity, which should drive elasticity and demand and a growth of sustainable markets*."

110.    Defendants would make numerous other false and misleading statements about First Solar achieving grid parity.  *See* §V.B.

111.    Unbeknownst to investors, First Solar was not remotely close to achieving its Grid Parity Roadmap goals, or grid parity for that matter.  As investors would learn on December 14, 2011, the only way for First Solar to even get remotely close to grid parity was to slash the Company's profit margins.  The costs of building First Solar's solar farms were simply far greater than Defendants reported to investors.  Defective panels, heat degradation, runaway BOS costs, and other problems (described herein and in §§IV.B., C., D., and E.), made actual production costs far greater than what was required to be at (or even be close to) grid parity.

112.    According to CW7, a Cost Estimator in the EPC Performance Optimization unit of First Solar from November 2010 to August 2013, First Solar was nowhere close to reaching grid parity and it would be impossible for the Company to do so in or by 2014.  CW7's job was to calculate how much the Company should bid for utility scale power plant projects.  To do that, CW7 obtained cost estimates from

the different First Solar divisions involved in the construction of a power plant and aggregated those costs.  Based on his/her knowledge of the Company's costs to build plants, CW7 knew in 2011 that it was impossible for the Company to achieve grid parity by 2014.  According to CW7, the biggest problem with achieving grid parity was the Company continually had cost overruns and "non-standard" costs at its power plant projects.  According to CW7, First Solar's mid-level employees knew there was no basis for Defendants' assertions that First Solar would be able to achieve grid parity in 2014, but Defendants insisted it would happen nonetheless.  As CW7 summed it up: "***The CEO was telling us we were getting to grid parity, we weren't telling him***."

113.   CW15 confirms the account of CW7.  CW15 worked as a Director of Systems Engineering at First Solar from December 2007 through October 2013. CW15 worked within First Solar's Engineering, Procurement and Construction Division.

114.   CW15 was aware of the capital costs of constructing the solar farms. During the time of his/her employment, according to CW15, the Company was never approaching the ability to sell electricity at grid parity and make a profit. The Company was not even close to reaching grid parity.  According to CW15:  "***It was just so far off***."

115.   Further, according to CW15, the Company's costs were too high to reach grid parity by 2013 or 2014.  "***They had too far to go***," according to CW15.  "***They would have had to dramatically lower costs.  There's a reasonable expectation of lowering costs, but you can't just cut them in half in six months [or] a year.  You've got to be reasonable, it's got to be something they can do reasonably***."  Defendants' representations to investors simply weren't reasonable.

116.   Similarly, CW10, a project development engineer for First Solar from October 2011 to May 2012, also felt First Solar was not close to reaching grid parity. During his/her employment at First Solar, he/she believed the Company was five to ten years away from reaching grid parity.  Moreover, he/she did not believe the Company

was on schedule with the Grid Parity Roadmap.

117.    Defendants continued to assure investors that First Solar was on the verge of obtaining grid parity – without sacrificing margins – up through the fourth quarter of 2011.  Indeed, even *after* the Company's November 3, 2011 conference call, Defendants continued to reassure investors First Solar was on track to achieve the goals set forth in the Grid Parity Roadmap, including that First Solar was on track to (i) lower the cost per watt of its panels as outlined in the Grid Parity Roadmap; (ii) lower BOS costs as outlined in the Grid Parity Roadmap; and (iii) First Solar would achieve grid parity by selling systems for approximately $2.25 per watt, as set forth in the Grid Parity Roadmap.

118.    Then, on December 14, 2011, the Company disclosed facts sufficient for Plaintiffs and others to discern that First Solar was not on track to achieve grid parity as set forth in the Grid Parity Roadmap.  Among other things, First Solar revealed for the first time that to reach grid parity First Solar would have to slash its operating margins to just 8-12% and price its systems at $1.40 to $1.60 per watt – not the system cost of  $2.00 to $2.50 per watt and 20-25% operating margins Defendants had repeatedly told investors beginning with the Grid Parity Roadmap in 2009 lasting through the Company's third quarter 2011 conference call in November 2011.

119.    When questioned directly by Plaintiffs about these significant inconsistencies, Defendants could provide no reasonable or legitimate explanation.

G.    Defendants Knew There Would be an Oversupply of Cheap Panels in the Market, but Refused to Adjust Earnings Forecasts Accordingly

120.    At the end of 2010 and throughout 2011, Defendants repeatedly assured investors the Company had set conservative earnings targets and that First Solar was on target to achieve 2011 guidance.

121.    First Solar did not come close to achieving its 2011 earnings targets.  For example, on December 14, 2010 Defendants indicated "EPS is forecasted to grow to between $8.75 to $9.50 per fully diluted share" for fiscal year 2011.  Defendants

30

increased EPS forecasts on May 3, 2011.  Defendants indicated earnings would be $9.25 to $9.75 per share for fiscal year 2011.  Ultimately First Solar reported a net loss for the year of ($0.46) per share.  Defendants' earnings forecasts intentionally and/or recklessly ignored the problems detailed herein, including (i) rampant defects and panel degradation that would erode customer goodwill and drive massive charges to earnings; (ii) cost metrics that were not as good as publicly reported; (iii) building and permitting issues resulting from known defects; and (iv) that First Solar's financial statements did not comply with GAAP.

122.    Further, throughout 2011 Defendants repeatedly reassured investors that the Company's earnings guidance took into account global supply/demand pressures, specifically the glut of panels worldwide as solar panel manufacturers ramped up production.   This was false and misleading.   Contrary to Defendants' statements, Defendants ignored repeated warnings from First Solar's employees whose job was to conduct analyses with regard to panel pricing.

123.    According to CW16, Defendants refused to adjust earnings targets to take into account the worldwide oversupply of panels in the market despite repeated warnings from analysts within the Company.   CW16 was Director of Sales, North America, for First Solar from April 2009 to June 2011.  S/He reported to two bosses, Jim Lamon, EVP of First Solar's EPC division, and T.K. Kallenbach, who at the time, worked as EVP of Marketing and Sales.  As part of CW16's job, going back to the end of 2009, he sat in on weekly sales forecast meetings with several senior level executives, including the CFO, Kallenbach, the EVP of Sales and Marketing, the EVP of Business Development, the President of Operations and a "whole slew of VPs."  A team of financial planners and analysts also attended these meetings and advised senior executives about sales and market forecasts.

124.    According to CW16, during these meetings, the analysts informed senior executives the Company should expect the high demand/low supply global solar panel market to shift to an over-supply environment.    Once that shift took place,

manufacturers would begin to dump their products on the market for cheaper prices and subsequently cause profit margins to drop.

125. CW16 said these dire forecast were discussed frequently for 18 months prior to his/her June 2011 departure – that is, First Solar knew over supply would be a problem going back to 2009.  "None of it came as a surprise," CW16 said.

126. According to CW16, First Solar's senior executive team ignored the dire predictions about the market shift.  As CW16 stated:  "***It was a little bit like an ostrich with his head in the sand***. They didn't want to hear the storm clouds were getting darker and getting closer."  Defendants did not want to admit that the high demand market, which was so lucrative, would soon come to an end.

127. Ultimately, according to CW16, when solar panel prices declined due to the global supply/demand dynamics that First Solar analysts had been warning about, First Solar customers pushed back against the Company's prices and demanded price concessions.  Prior to CW16 leaving in June 2011, customers were refusing to honor contracts unless First Solar granted price concessions – which First Solar did.

## H. Defendants Issued False Financials and Violated GAAP

128. As a result of the foregoing problems at First Solar, particularly defective panels and degradation, First Solar reported financial results that were not accurate.

129. First Solar sold each module with a specification guaranteeing it would produce at least a certain level of power during the first 10 years and 15 years following installation.  These performance specifications were unproven.  Defendants and the Company, in violation of Generally Accepted Accounting Principles ("GAAP"), improperly accounted for and failed to disclose the true costs associated with modules that failed to meet those specifications.  First Solar also violated GAAP and SEC rules when it made materially false and misleading statements regarding First Solar's revenues and the successful installation of their modules sold in hot climates.  Accordingly, First Solar reported materially false and misleading financial results in First Solar's publicly issued financial statements and related earnings releases.

130.   First Solar materially understated warranty reserves and related liabilities, in violation of GAAP, for costs associated with the defective modules including those related to the "excursion" and degradation defects.

131.   First Solar failed to make required disclosures, in violation of GAAP, regarding the extent of the costs the Company would ultimately incur as a result of the product defects known by Defendants.

132.   First Solar failed to disclose and properly account for revenue, in violation of GAAP, where the stated performance specifications had not been demonstrated as achievable, particularly for solar modules placed in hot climates.  In accordance with ASC 605-10-S99, revenue is required to be deferred when the "seller has not previously demonstrated that the delivered product meets the seller's specifications."

133.   First Solar improperly failed to disclose in its financial statements and the Management's Discussion and Analysis section of its Form 10-Ks and Form 10-Qs the material effect on net sales for the known trend and uncertainties and known geographical concentration risk associated with the manufacturing excursion and heat degradation defects. (Reg. S-K Item 303, ASC 275/1.)

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

134.   The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of First Solar common stock, which consequently traded at prices in excess of its true value.

135.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for First Solar common stock was an efficient market.  First Solar common stock was actively traded on a highly efficient and automated market.  First Solar filed periodic public reports with the SEC and was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about

the Company.  First Solar regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace.  As a result, and which is empirically evident, the market for First Solar equity securities promptly digested current information regarding First Solar from all publicly-available sources and reflected such information in the First Solar common stock price.

136.    Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' scheme, including: the magnitude of First Solar's manufacturing defects, inability to achieve grid parity, and heat-degradation issues, as detailed herein, and other facts concerning First Solar's business.

137.    Plaintiffs also read, or listened to, and relied on Defendants' materially false and misleading statements prior to purchasing First Solar common stock at artificially inflated prices. Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's (i) actual and anticipated progress in achieving grid parity; (ii) the extent and cost of defective panels; (iii) how well First Solar's panels were suited to utility scale projects, including heat degradation and other forms of degradation; (iv) First Solar's costs of building solar power farms, including cost per watt and BOS metrics; (v) First Solar's pipeline of projects, and the profitability of those projects; and (vi) First Solar's ability to run profitably in a high supply/low demand global solar panel market.

138.    Plaintiffs specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein at ¶¶146-229, which include the false and misleading statements contained in (i) First Solar's public press releases, as alleged herein; (ii) First Solar's SEC filings on Forms 10-Q and 10-K filed with the SEC, as alleged herein; (iii) First Solar's analyst conference calls alleged herein; and (iv) various direct communications between Defendants and Plaintiffs.

139.    Throughout the relevant period, Defendants issued statements in press

34

releases and SEC filings, among other things, that were false and misleading for the reasons set forth in §IV, *supra*.

### A. Defendants' False and Misleading Statements Prior to Fall 2010

140.    Plaintiffs bring this action with respect to First Solar shares Plaintiffs purchased from May 2011 through December 2011.  Prior to May 2011 – indeed, prior to October 2010 – Defendants made numerous material false and misleading statements concerning First Solar.

141.    Though Plaintiffs did not begin purchasing First Solar shares until May 2011, Defendants' false statements prior to May 2011 provide context for later false and misleading statements.  Defendants' false and misleading statements prior to May 2011 artificially inflated the Company's stock until partial disclosures of the truth revealed Defendants' prior false and misleading statements did not accurately depict the truth concerning the Company's solar panels, financial condition, or future prospects.

142.    For example, in July 2010, Defendants falsely assured investors that the manufacturing "excursion" was limited and efforts to fix the problem had been successful:

> During the period from June of 2008 to June of 2009, a manufacturing excursion occurred, affecting less than 4% of the total product manufacturer within the period.  The excursion could result in possible premature power loss in affected modules.

> The root cause was identified and subsequently mitigated in June of 2009.  Ongoing testing confirms the corrective actions are effective.  We've been working directly with impacted customers to replace the affected modules and these efforts are well underway, and in some cases, complete.

> Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail.

143.    Furthermore, throughout First Solar's existence as a public entity, the Company and the Individual Defendants espoused First Solar's ability to reach grid

parity.  Most notably, the Company set forth the Grid Parity Roadmap on June 24, 2009, as alleged herein at ¶¶103-104.  Defendants' statements concerning grid parity prior to 2011 provide context for similar statements made during 2011.  Certainly, by no later than May 2011, Defendants' statements concerning grid parity were false and misleading.

144.   In the interest of brevity, and because Plaintiffs' action concerns Plaintiffs' purchases of First Solar stock from May 4, 2011 and afterwards, Plaintiffs do not specifically plead each of Defendants' false and misleading statements prior to October 2010.

### B.   Defendants' False and Misleading Statements From October 2010 Through December 14, 2011

145.   Plaintiffs purchased millions of First Solar shares during the period between May 4, 2011 and December 2011.  In making these purchases, Plaintiffs relied on statements made by Defendants both prior to May 2011 and afterwards. Plaintiffs paid particularly close attention to Defendants' false and misleading statements made from October 2010 through December 14, 2011.  Upon suspecting that Defendants had misrepresented the truth concerning, among other things, First Solar's ability to achieve grid parity, Defendants sold their First Solar shares after the December 14, 2011 revelations of the truth.  Due to the large size of Plaintiffs' First Solar holdings, Plaintiffs' sales occurred from December 14, 2011 to February 28, 2012.

**October 28, 2010: 2010 Third Quarter Earnings Release and Conference Call**

146.   On October 28, 2010, the Company issued a press release announcing its financial results for the third fiscal quarter of 2010 ("3Q 2010").  The Company reported net income of $177 million, or $2.04 diluted EPS, and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million, for the same period in the prior year.

147.   Also on October 28, 2010, First Solar hosted a conference call with

36

various securities analysts to discuss the Company's 3Q 2010 financial results and other important aspects of the Company's business.  Gillette, Meyerhoff, Sohn and Polizzotto participated in this call.

148.   During the 3Q 2010 earnings conference call, Defendant Gillette stated: "Our manufacturing cost per watt was $0.77, which is down $0.08 or 10% year-over-year, and up $0.01 over Q2 of this year."   Although cost per watt had increased slightly, Sohn reassured investors this was due to implementing changes to the manufacturing process and that Defendants "expect to continue to be on [the] cost-per-watt roadmap over the long term."

149.   During the call, Defendant Gillette continued to conceal the Company's cost overruns and heat degradation problems by touting the success of its solar projects in the Southwestern U.S. – even though these projects – according to CW7 – were grossly over-budget.  Gillette falsely stated:  "[C]onstruction on both the 30 megawatt Cimarron and 48 megawatt Copper Mountain facilities is progressing very well."

150.   Defendant Sohn also falsely reassured investors the manufacturing excursion was under control and the Company did not have to take further reserves for remediation of the problem:  "In terms of the excursion that we mentioned last time, there were no additional costs incurred in Q3."

151.   During the conference call, Defendant Gillette also falsely reassured investors First Solar was driving its cost of producing solar electricity to grid parity:

> Although the solar markets and government policies continued to evolve, First Solar's growth strategy remains the same.  We are focused on our mission, which is to enable a world powered by clean, affordable solar electricity by driving the LCOE of solar power to parity with fossil fuel peaking and insuring that system owners achieve an acceptable ROE.
>
> Our goal continues to be $0.10 to $0.12 per kilowatt hour to compete with peaking assets by combined cycle gas generation.  Our decisions are guided by the goal of earning a RONA that exceeds our weighted average cost to capital by at least 5%.
>
> We intend to lead the industry from the existing subsidized markets through transition markets to large sustainable markets based on economics and minimal subsidies.

37

**November 1, 2010: 3Q 2010 Form 10-Q**

152.    On November 1, 2010, First Solar filed its quarterly report for the quarter ending September 25, 2010 on Form 10-Q.   The Form 10-Q reaffirmed the false financials announced in the October 28, 2010 press release and conference call. Defendant Zhu signed the Form 10-Q.

153.    In the Third Quarter 10-Q, Defendants falsely reassured investors the Company was successfully reducing its cost per watt manufacturing costs as set forth in the Grid Parity Roadmap:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.85 during the three months ended September 26, 2009 to $0.77 during the three months ended September 25, 2010.

154.    Defendants also falsely reassured investors that no further expenses were being incurred in connection with the "manufacturing excursion":

> The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty.  During the period from June 2008 to June 2009, a manufacturing excursion occurred *affecting less than 4% of the total product manufactured within the period*.   The excursion could result in possible premature power loss in the affected modules.  The root cause was identified and subsequently mitigated in June 2009.  On-going testing confirms the corrective actions are effective.  We have been working directly with impacted customers to replace the affected modules and *these efforts are well underway and, in some cases, complete*. Some of these efforts go beyond our normal warranty coverage.    Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field.   We did not incur any incremental costs during the third quarter of 2010.

155.    Defendants' statements in the 3Q 2010 Form 10-Q and the October 28, 2010 press release and earnings conference call set forth above were materially false and misleading when made for the reasons set forth in §IV.   More specifically, the publicly reported financial results were false and misleading for the reasons set forth in §IV.H.  First Solar's manufacturing cost per watt was not $0.77.  *See* §IV.D.  The

Cimarron and Copper Mountain facilities were not "progressing very well" but were suffering massive cost overruns that First Solar had not budgeted for. *See* §IV.E. The manufacturing "excursion" impacted more than 4% of panels manufactured within the specified period, and efforts to remediate were not nearly close to finished. *See* §IV.B. And, First Solar was not "driving the LCOE of solar power to parity with fossil fuel peaking" – First Solar was not close to achieving grid parity. *See* §IV.F.

**December 8, 2010: Barclays Capital Global Technology Conference**

156.   On December 8, 2010, Defendant Gillette, then First Solar's CEO, spoke with investors and analysts at the Barclays Capital Global Technology Conference. Answering questions from Barclays Capital analyst Vishal Shah, Gillette boasted about First Solar's Grid Parity Roadmap and the success First Solar was having in achieving grid parity.

157.   Gillette falsely and misleadingly informed investors that First Solar would be at grid parity by selling systems at $2.00 to $2.30 a watt. Furthermore, Gillette falsely told investors First Solar had, at that time, already brought down the major costs associated with the system to approximately $1.77-$0.77 module costs and BOS costs around $1.00:

> VISHAL SHAH: But that assumes the current cost structure of somewhere around $0.75 per watt of module costs, and your balance of system costs around $1.25?
>
> ROB GILLETTE: ***Around a dollar***, right.  And then some addition developmental costs.  So the goal is on an installed basis, ***you have got to be in the $2.00 to $2.30 range, to be able to sell a site there***, and be able to provide that.  So as you know ***we have a road map*** that drives down the cost of our module, and we started out around the $2.00 range and now it is $0.77.  Our goal by 2014 is to be $0.52 to $0.63 per watt.  And the BOS side, which is the rest of the construction to install a PV site, we start it out at $1.40, with a long-range goal of being closer to $1.00.  ***I would say we have made great progress to that end***, so we will continue to do that.  And then we are learning through all of the work and the megawatts that we are going to install, how to improve cycle time, how to reduce the costs of the BOS components, and drive a lower cost per kilowatt hours in terms of total costs installed.

158.   According to Gillette, system pricing in the $2.00 to $2.30 per watt range would enable First Solar to compete with "traditional peaking resources" – aka natural

39

gas peakers.    This would unlock a huge market for solar power that would substantially increase demand for the First Solar's products and services.  According to Gillette, pricing at $2.00 to $2.30 per watt would unlock "5% of the total generating market or less, [and] it is a significant market opportunity, above a terawatt globally that we don't participate in today."

159.   Defendants' statements in the December 8, 2010 Barclays Capital Global Technology Conference set forth above were materially false and misleading when made for the reasons set forth in §IV.  More specifically, First Solar had not "made great progress" as set forth in its "road map" to achieving grid parity.  *See* §IV.F.  First Solar's costs were not as low as Defendants depicted, thus First Solar was not close to achieving grid parity and unlocking a huge portion of the electricity generation market.  *Id.*

**December 14, 2010: First Solar 2011 Guidance**

160.   On December 14, 2010, the Company issued a press release announcing the Company's projected earnings for 2011:

> In 2011, First Solar forecasts net sales in the range of $3.7 to $3.9 billion, up about 46% year over year compared to the midpoint of 2010 guidance provided on October 28, 2010.  The net sales forecast is comprised of $2.8 to $2.9 billion of module sales and $0.9 to $1.0 billion of EPC/project development sales.  EPS is forecasted to grow to between $8.75 to $9.50 per fully diluted share and consolidated operating income is $875 to $975 million.

161.   Also on December 14, 2010, First Solar hosted a conference call to discuss the Company's 2011 financial guidance and other important aspects of the Company's business.   Gillette, Meyerhoff, Sohn and Polizzotto participated in this call.

162.   During the conference call, Defendants reassured investors the Company was on track to achieve the goals set forth in the Grid Parity Roadmap:

> In the long-term, our mission remains the same, to enable the world powered by clean, affordable electricity by driving the levelized costs of solar power to parity with fossil fuel peaking electricity.  We intend to

lead the industry from the existing gigawatt sized, subsidized markets through transition markets to large terawatt sized, sustainable electricity markets, based on competitive economics and minimal subsidies. Internally, our strategic decisions are guided by the goal of earning a return on net assets that exceeds our weighted average cost of capital by at least 5%.

First Solar is setting the standard as the industry's leading solutions provider with our focus on minimizing LCOE, maximizing energy yield, enabling reliable power generation, which integrates well with existing generation assets. Our ***module, balance of systems, and project development cost reduction road maps remain on track to achieve our goal to reach electricity rates of $0.10 to $0.12 per kilowatt hour, which we believe is parity with fossil fuel peaking rates***. Our goal is to reach those levels by the end of 2014, and by the end of 2011 we expect to be within 20% to 25% of that goal.

163.    Gillette also misleadingly told investors First Solar completed Copper Mountain without disclosing the myriad serious problems with Copper Mountain outlined by CW7.  Gillette said, "we recently completed construction of the 48-megawatt Copper Mountain site for Sempra Generation ahead of schedule."

164.    Defendant Gillette misleadingly asserted the Company's proven systems performance and low cost of electricity production was translating to real, profitable business:   "We are experiencing strong buyer demand for our utility scale systems projects, due to our proven systems performance, low LCOE, fast lead time to generation and attractive project economics."

165.    Defendant Meyerhoff misleadingly assured investors that First Solar had confidence in its 2011 guidance because due to the certainty of pricing with projects in the pipeline:  "System module prices around our captive pipeline have established economics, due to the set electricity prices in our PPAs . . . ."

166.    Defendants' statements in the December 14, 2010 press release and conference call as set forth above were materially false and misleading when made for the reasons set forth in §IV.  More specifically, Defendants knew, but failed to disclose, that their 2011 earnings forecast did not account for (i) a known surplus of solar panels worldwide that would drive down prices (*see* §IV.G.); (ii) known defects

and degradation in First Solar's panels (*see* §§IV.B. and C.); (iii) known cost overruns on projects in First Solar's pipeline of business, which made building out the pipeline not as profitable in reality as First Solar projected (*see* §IV.E.); or (iv) the fact that First Solar's prior financial results had not complied with GAAP (*see* §IV.H.).

167.    Furthermore, the Company's "captive pipeline" of solar projects did not provide "visibility" to 2011 earnings, as the projects did not (contrary to Meyerhoff's statements) have "established economics" but suffered from massive cost overruns. *See* §IV.E.    Further, the Company's "module, balance of systems and project development cost reduction road maps" did NOT "remain on track."  *See* §IV.F.

**February 24, 2011: 2010 Earnings Release and Conference Call**

168.    On February 24, 2011, First Solar issued a press release announcing its fourth quarter and full year 2010 financial results. First Solar reported net sales of $610 million for the fourth quarter and $2,564 million for the year.  Earnings per fully diluted share were $1.80 for the fourth quarter and $7.68 for the year.  Defendants also gave 2011 EPS guidance of $9.25-$9.75 per fully diluted share for the full year.  The press release also indicated:  "'In the fourth quarter the operations team executed well, and we sold 400 MW of projects in North America, positioning us to achieve our 2011 growth goals,'" said Rob Gillette, CEO of First Solar.  "'We have good demand visibility in 2011 and a broader geographic reach, which gives us confidence in our ability to sell the 2 GW that we plan to produce.'"

169.    Also on February 24, 2011, First Solar hosted a conference call with various securities analysts to discuss the Company's 2010 financial results and other important aspects of the Company's business.  Gillette, Meyerhoff, Zhu and Polizzotto participated in this call.

170.    During the analyst conference call, Defendant Gillette falsely reassured investors that First Solar had substantially reduced its costs of producing electricity and accomplished substantial progress towards achieving grid parity.  With respect to BOS costs, Gillette stated:

Overall, 2010 balance of system cost improved almost 30% compared to 2008, *which is well ahead of our 2014 balance of systems cost reduction roadmap*. This strong performance demonstrates the improvements our EPC team has made in reducing cycle time and cost per watt through engineering design improvements and economies of scale. Since BOS costs make up a large portion of LCOE, these achievements are important *as we advanced to our goal of grid parity*.

171. Gillette also falsely assured investors that First Solar was making substantial reductions in the cost per watt metric: "Our manufacturing cost per watt was $0.75, which is down $0.09 or 11% year-over-year and down $0.02 compared to the third quarter."

172. With respect to the cost per watt, Defendant Gillette again reassured investors the Company was on track with respect to the Grid Parity Roadmap:

[W]hat we do is, we take a look at all of the costs, both raw material, labor and the mix of the plants and facilities that we have, so when we plan the cost reduction roadmap, we consider all those different elements in terms of our plan. So we still have the objective to be between $0.52 and $0.60 by 2014 and *we think we're making good progress to that end with the improvements in efficiency in Q4 and a $0.02 gain from Q3 to Q4* and as well as the 11% reduction year over year. So that's still our plan and it includes the mix that we have.

173. Gillette falsely assured investors First Solar was close to reaching grid parity: "Meanwhile, new southwestern US PPA prices are already declining from the $0.14 to $0.16 per kilowatt hour in our contracted projects towards grid parity of $0.10 to $0.12 per kilowatt hour by 2014." Further with regard to achieving the Company's Grid Parity Roadmap, he further falsely declared: "First Solar is on a roadmap to minimize LCOE and maximize energy yield" – which was directly reflected in the Company's presentation materials.

174. Indeed, Defendants would falsely claim First Solar was already pricing "closer and closer" to grid parity when making contracts for projects being added to the pipeline. As Defendant Meyerhoff misleadingly explained, First Solar was bidding on projects (entering into power purchase agreements or PPAs) near grid parity: "I think if you look at the U.S. market right now, what we see is as it relates to signing new PPAs on the power side, as you go into the outer years, the market has certainly

become a lot more competitive **and, generally, bidding activities are moving closer and closer to the grid parity goals as they should, and as we described in our strategy**." Defendant Gillette would falsely claim such bids were made with great confidence in First Solar's ability to perform and based on established economics: "**On the systems side, our pricing is based on the established economics in the PPAs and we know that**."

175.   Importantly, Defendants were quick to reassure investors the Company wasn't sacrificing margins or lowering guidance for 2011 in an effort to bring down systems costs. Defendants gave 2011 guidance of $9.25 to $9.75 per diluted share, and Gillette professed "we have high confidence in 2011 here." Zhu chimed in: "We have high confidence in terms of the operating margin . . . ." And, Gillette, added "we feel pretty good about being able to provide that guidance."

176.   Defendant Gillette misleadingly summarized that all of these things – including First Solar's purported low electricity production costs and proven technology – were translating to real and profitable business: "Overall, we're experiencing strong buyer demand for utilities scale systems projects due to our proven systems performance, low LCOE, fast lead time to generation and attractive project economics." And, the Company had, according to Gillette, "delivered solid Q4 and 2010 results that positions us well for 2011 and 2012 growth."

177.   During the call, Defendant Zhu falsely reassured analysts that the claims process for the excursion problem was concluded:

> During the fourth quarter we reserved an additional $8.5 million for the module replacement program discussed with you in our second-quarter 2010 earnings call. **In Q4 we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate**.

178.   During the February 24, 2011 conference call, Defendants also misleadingly told investors First Solar's Copper Mountain and Cimarron solar farms had been finished without telling investors the facilities were not producing electricity as guaranteed under the contracts.

44

179.   Defendants' statements concerning grid parity were significant, as recognized by industry media reports.  For instance, on February 28, 2011, in an article titled "First Solar says costs are more in line with gas capacity," the Electric Power Daily reported:

> First Solar is on track to reaching "grid parity" with natural gas-fired peaking plants by 2014, company officials said last week.
>
> The Tempe, Arizona-based company, which builds solar modules and develops utility-scale projects, cut its production costs by 11% in the fourth quarter, to 75 cents/watt, compared with a year ago, Rob Gillette, First Solar CEO told analysts Thursday during a conference call.  The company has also lowered the cost of building projects through improved engineering and economies of scale, he said.
>
> The company's power purchase agreements in the Southwest are falling from the $140/MWh to $160/MWh range for contracted projects toward grid parity of $100/MWh to $120/MWh by 2014, Gillette said.

**February 28, 2011:  2010 Form 10-K**

180.   On February 28, 2011, First Solar filed its annual report for the year ending December 31, 2010 on Form 10-K.  The Form 10-K reaffirmed the false financials announced in the February 24, 2011 press release and conference call.  Defendants Ahearn, Gillette and Zhu signed the Form 10-K.

181.   In the Form 10-K, Defendants falsely stated:

> In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.
>
> * * *
>
> Our thin-film technology also has ***relatively high energy performance*** in low light and ***high temperature environments*** compared with traditional crystalline silicon solar modules.

182.   With regards to the manufacturing excursion, Defendants again falsely reassured investors the impact was minimal and properly reserved for:

> The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty.  During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period.  The excursion could result in possible premature power loss in the affected modules.  The root cause was identified and subsequently mitigated in

45

June 2009.  On-going testing confirms that the corrective actions taken are effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  Some of these efforts go beyond our normal warranty coverage.  Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field.  Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

183.    Defendants' statements in the 2010 Form 10-K and the February 24, 2011 press release and earnings conference call were materially false and misleading when made for the reasons set forth in §IV.  More specifically, the publicly reported financial results were false and misleading for the reasons set forth in §IV.H.  First Solar was not "well ahead" of its balance of systems cost reduction roadmap; rather, First Solar was suffering substantial BOS cost overruns and was not close to being on track to achieving grid parity.  *See* §§IV.E. and F.  First Solar's pricing was not "moving closer and closer" to grid parity based on "established economics in the PPAs" – First Solar was not close to grid parity and was suffering massive cost overruns.  *See* §§IV.E. and F.  First Solar's manufacturing cost per watt was not $0.75. *See* §IV.D.

184.    First Solar's revised 2011 guidance was misleading, and the Company did not have "high confidence" in achieving its targets.  Defendants knew, but failed to disclose, that their 2011 earnings forecast did not account for numerous, undisclosed factors.  *See* §IV.G.

185.    It was misleading to tell investors that First Solar had "concluded [the] claims process" for the manufacturing excursion, without disclosing that the Company had numerous problems with its panels and would have to spend over $215 million in remediation of these problems – only a small fraction of which had been properly reserved for.  *See* §§IV.B. and H.  First Solar was not experiencing "high energy performance" in "high temperature environments" as degradation was leading to massive cost overruns and other problems at the Company's solar farms.  It was

misleading to not disclose problems with degradation known to the Company.  *See* §IV.C.  It was also misleading to assert that only 4% of panels manufactured during the period of the excursion were impacted.  *See* §IV.B.

**First Quarter 2011 Earnings Release and Conference Call**

186.  On May 3, 2011, First Solar issued a press release announcing its first quarter 2011 ("1Q 2011") financial results.  The Company reported net sales of $567 million and $1.33 diluted EPS for the quarter ended March 31, 2011.  The Company also maintained EPS guidance of $9.25-$9.75 per fully diluted share for the full year.  The press release indicated:  "'Despite European market uncertainties, First Solar has good visibility into our demand for 2011,'" said Rob Gillette, CEO of First Solar.  "'We continue to execute our cost roadmaps, invest in new module capacity, build our project pipeline and develop promising new markets around the world.'"

187.  Also on May 3, 2011, First Solar hosted a conference call with various securities analysts to discuss the Company's 2010 financial results.  Gillette, Widmar, and Polizzotto participated in this call.

188.  During the analyst conference call, Defendant Gillette falsely reassured investors that First Solar was still on track towards achieving grid parity.

> We are focused on minimizing LCOE, optimizing project returns and enabling the fastest lead time to generation to drive towards grid parity in the markets we serve.  This will be accomplished by reducing our proprietary thin film module cost per watt to $0.52 to $0.63 by 2014, and increasing version efficiency to 13 1/2% to 14% by 2014.  ***We are on plan to achieve this*** and have the lowest module costs in the industry today by 30% to 40%.  These improvements, along with continued execution of our balance and systems roadmap, ***should allow us to drive pricing to grid parity***.  ***First Solar's project development pipeline and EPC capability are world class***, and we will leverage this to provide complete low-cost application solutions as we develop new business and segments.

189.  Defendants made similar statements concerning grid parity in the Company's presentation materials.

190.  During the 1Q 2011 earnings conference call, Defendant Gillette also falsely stated:  "Core costs, which excludes the ramp penalty and stock-based

47

compensation, was $0.73 per watt, down 9% year-over-year, in-line with our cost reduction roadmap."

191.   Gillette also falsely reassured investors that First Solar had factored into their earnings guidance the impact of global market supply/demand for solar panels: "Tighter industry economics are expected in the second half of 2011, which we believe are largely reflected in our guidance."

**May 5, 2011: 1Q 2011 Form 10-Q**

192.   On May 5, 2011, First Solar filed its quarterly report for the quarter ending March 31, 2011 on Form 10-Q.  The Form 10-Q reaffirmed the false financials announced in the May 3, 2011 press release and conference call.  The Form 10-Q was signed by Defendant Zhu.

193.   With regards to the manufacturing excursion, Defendants again falsely reassured investors the impact was minimal and properly reserved for:

> Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty.  During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period.  The excursion could result in possible premature power loss in the affected modules.  The root cause was identified and subsequently mitigated in June 2009.  On-going testing confirms that the corrective actions taken have been effective.  We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  Some of these efforts go beyond our normal warranty coverage.  No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

194.   Defendants' statements in the 1Q 2011 Form 10-Q and the May 3, 2011 press release and earnings conference call set forth above were materially false and misleading when made for the reasons set forth in §IV.  More specifically, the publicly reported financial results were false and misleading for the reasons set forth in §IV.H. The Company's revised EPS guidance was false and misleading for the reasons set forth in §IV.G.  The Company was not "on plan to achieve" grid parity and execution on the Grid Parity Roadmap was not now allowing First Solar to "drive pricing to grid

parity." *See* §IV.F.  It was also misleading for Defendants to assert defective panels were limited to only 4% made during the limited period or assert the warranty cost for defective panels was only $37.9 million, when the Company would have to spend over $215 million in connection with defective panels and more for degradation by the end of 2011.  *See* §§IV.B and C.  Further, First Solar's manufacturing cost per watt (core cost) was not $0.73 as Defendants claimed.  *See* §IV.D.

**May 17, 2011: JPMorgan Technology, Media and Telecom Conference**

195.  On May 17, 2011, Polizzotto (speaking on behalf of First Solar) spoke with investors at the JPMorgan Technology, Media and Telecom Conference.  During the conference, in which Polizzotto answered questions by audience members, Polizzotto again falsely and misleadingly reassured investors that First Solar was close to achieving grid parity and ahead of schedule to achieve First Solar's Grid Parity Roadmap targets:

> UNIDENTIFIED AUDIENCE MEMBER:  How fast are your cost[s] coming down the cost curve?  And then over the next say 3 to 5 years do you expect that to remain on trend or accelerate above trend or decelerate?

> LARRY POLIZZOTTO: So, there's really two important cost components in addition to project finance I talked about earlier.  There's the module itself and then there's the balance of system cost.

> And so the module itself, we have driven that down from about $2.49 per watt to latest quarter down to $0.75 a watt.  ***Core cost, if you take out plant start-up, is $0.73 a watt.***  Our goal is to get that down into the $0.50 to $0.60 range by 2014.  ***That range, along with balance of system, enables us to sell a system which would enable a $0.10 per watt, kilowatt hour price by the seller of that power by 2014 in a high irradiant zone.***

> So, that $0.50 to $0.60 range is something and that roadmap is about an 8% per year decline.  Now, beyond that, technically speaking, it's possible that you could go lower because the technology is newer.  But our roadmap kind of right now only goes through 2014.  And the reason for that is obviously getting to our goal of grid parity at $0.10.

> ***In addition to that, the balance of system cost, so this is like mounting hardware and inverters and the labor that goes with that, everything else you need.  About 2 years ago, we said that was $1.40.  Our roadmap is to get that down to the mid $0.90 range.  <u>We are very close to that at this point.</u>***  And so, that's a 2014 goal.

49

1
2

***I think at this point we believe that we're doing better than that roadmap, so there's potentially some opportunity on that. We haven't updated our roadmap because we're fairly close to our 2014 goal on that.***

3
4
5
6

***So those things together are what you need in order to get to that $0.10 level. So, I think we feel pretty good about our cost roadmap.*** But there's really not an endpoint at this point, I guess you could say, in terms of where we think our costs can go. We just have it, it extends out through 2014 and those two together get us to where we're trying to go with [just] $0.10.

7
8
9
10
11
12

196.   Defendants' statements during the JPMorgan Technology, Media and Telecom Conference set forth above were materially false and misleading when made for the reasons set forth in §IV. More specifically, the Company was ***not*** (i) "very close" to achieving the goals set forth in the Grid Parity Roadmap, (ii) "doing better than that roadmap", or (iii) on target to achieve electricity production at $0.10 per kilowatt hour. *See* §IV.F.

13

**August 4, 2011: Second Quarter 2011 Earnings Release and Conference Call**

14
15
16
17
18

197.   On August 4, 2011, First Solar issued a press release announcing its second quarter 2011 ("2Q 2011") financial results. The Company reported net sales of $533 million and $0.70 diluted EPS for the quarter ended June 30, 2011. The Company also reported EPS guidance of $9.00 - $9.50 per fully diluted share for the full year. The press release indicated:

19
20
21
22

"First Solar continued to execute in the quarter despite a challenging European market, and our 2011 outlook remains solid due to our differentiated and resilient business model," said Rob Gillette, CEO of First Solar. "We expect stronger performance in the second half of 2011 as we build projects from our systems pipeline, develop promising new markets, execute our cost reduction roadmaps and continue to improve module efficiencies."

23
24
25

198.   Also on August 4, 2011, First Solar hosted a conference call with various securities analysts to discuss the Company's 2Q 2011 financial results. Defendants Gillette and Widmar participated in this call.

26
27
28

199.   Defendant Gillette falsely and misleadingly represented that every element of First Solar's business was doing great. According to Gillette, First Solar was on target to achieve the goals set forth in the Grid Parity Roadmap, and First Solar

had a robust pipeline of solar farms to build out, thus profit and revenue targets were readily obtainable:

> To summarize, we continued to execute in the quarter despite a challenging European market and remained focused on achieving our mission.  Our visibility is improving for the second half of the year.  An increasing portion of *our revenues and profits are under our control as we construct our systems pipeline* and continue to diversify geographically.  ***Our LCOE is approaching grid parity, which should drive elasticity and demand and a growth of sustainable markets***.  We are investing for growth in the United States, India, the Middle East, Australia and China.  We are executing a systems pipeline and we're adding to it.  We continue to expand our factories and drive our products' roadmaps.  *We achieved major BOS and module efficiency milestones as a result of our investment in R&D and our continuous improvement processes*, and we have the financial strength to continue investing in the long-term future of our business.

> Finally, *our 2011 guidance is solid* due to our differentiated and resilient business model.

200.   During this call, Gillette similarly stated:

> Despite the recent market turbulence, our growth strategy remains unchanged.  We are focused on our mission of making solar affordable and sustainable *to gain access to the multi-terawatt peak electricity generation market*.  We are currently in a transition phase as FiTs and other government policies are progressing towards parity and market diversification continues.  *First Solar has made significant progress reducing [its] levelized cost of electricity*, diversifying geographically, and we expect price declines to continue to drive demand elasticity.

> On the next page, you can see we've made significant progress in lowering our total systems costs by 30% in 3 years.  If we can reduce that by another 19%, we believe that we can provide turnkey utility-scale systems that generate power at an LCOE of $0.10 to $0.12 per kilowatt hour in high-radiant zones like the U.S. Southwest, India, China, Australia, the Middle East, Spain and Italy.  This is what will drive our participation in the peak electricity generation market.

201.   During the question and answer period of the conference call, Defendant Gillette indicated the Company had both the externally disclosed Grid Parity Roadmap – which the Company was on target to achieve – and an internal, non-public plan that had the Company reaching grid parity even faster.  Gillette falsely and misleadingly stated:

> I think that the team is – we have what we call a go-fast plan internally. So we have *the commitment we have to you as our shareholders and externally to the roadmap that we put in place*, priced at [ph] $0.52 to

51

$0.63 and the 8% to 10% improvement year-over- year.  And that's kind of how we got there.  We mentioned today the improvement, and we're looking at things more and more on an installed cost per watt basis.  ***So we've made 30% improvement in the BOS cost***, and if we make the 20% improvement or 19%, we talked about between now and then, we will – we should be able to exceed the $0.91 to $0.98 range that we talked about in 2009.  So we made great progress there.  And that really is tradeoffs up between some inflation on raw materials, but then the great work would be EPC team and guys [ph] to continue to drive the cost down.  And then anything that we do, of course, on a go-fast level in engineering with Dave and his team contributes to further BOS cost reductions.  So at 13.5% to 14.5% range, ***we have internal plans to accelerate it as quickly as we can and hopefully you'll start to see that in our numbers***.

202.    With respect to BOS costs, Gillette falsely and misleadingly stated:

We also reached a milestone with our standard utility-scale Balance of Systems by achieving a cost level of $0.99 per watt.  ***BOS is down 29%*** from the second quarter of 2009.  ***We are now also close to our 2014 target for standard BOS of $0.91 to $0.98 per watt and can improve further*** as our planned module efficiencies increase to 13.5% to 14.5% by the end of 2014.

This ***major accomplishment*** is the result of our experience in team teaching [ph], investment in engineering and R&D, and cycles of learning from almost 400 megawatts of DC of projects built to date.

203.    With respect to pricing of solar panels and First Solar's cost per watt, Gillette falsely and misleadingly stated:

Module manufacturing and cost per watt was $0.75, which is flat quarter-over-quarter.  The benefit of our modules from low-cost manufacturing sites was offset by FX, lower line throughput, higher spending and factory ramp costs. Core costs, which excluded the ramp penalty and stock-based compensation, was $0.73 per watt. And we're very pleased to announce that our Malaysian plants have achieved a new core cost milestone of $0.69 per watt.

204.    Further, with respect to cost per watt, Gillette misleadingly stated:  "So what it means for our roadmap, is we're committed to delivering on the roadmap as we planned and still have that same target range in 2014 to get to that $0.52 to $0.63 range."

205.    After the call, First Solar's investors relations represented that First Solar was bidding on new projects with systems priced at $2.50-$2.70 per watt.  According to the Company, First Solar was very close to what Defendants had represented as equating to grid parity – a systems price of $2.25 per watt.

206.   In the Company's presentation slides, Defendants once again misleading reassured investors that by getting closer and closer to grid parity, First Solar would unlock more demand for its solar panels.  As the slide indicated, "Lower pricing drives volume elasticity & market diversification[.]"

207.   With regard to the Company's earnings guidance, Defendants again reassured investors First Solar would achieve the target results without any indication of the significant problems the Company was then experiencing.   The presentation slides misleadingly stated:   "2011 guidance is solid due to our differentiated and resilient business model[.]"

**August 5, 2011: 2Q 2011 Form 10-Q**

208.   On August 5, 2011, First Solar filed its quarterly report for the quarter ending June 30, 2011 on Form 10-Q.  The Form 10-Q reaffirmed the false financials announced in the August 4, 2011 press release and conference call.  The Form 10-Q was signed by Defendant Zhu.

209.   With regards to the manufacturing excursion, Defendants again falsely reassured investors the impact was minimal and properly reserved for:

> Cost of sales for the six months ended June 26, 2010 included $22.4 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009.  On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

210.   Defendants' statements in the 2Q 2011 Form 10-Q and the August 4, 2011 press release and earnings conference call set forth above were materially false and misleading when made for the reasons set forth in §IV.  More specifically, the

publicly reported financial results were false and misleading for the reasons set forth in §IV.H.  The Company's revised EPS guidance was false and misleading for the reasons set forth in §IV.G.  It was false and misleading for Defendants to claim "our 2011 guidance is solid."  *Id.*  It was also false and misleading to assert First Solar's "LCOE is approaching grid parity, which should drive elasticity and demand and a growth of sustainable markets."  *See* §IV.F.  First Solar was not approaching grid parity.  Similarly, it was false and misleading to assert BOS costs "are now also close to our 2014 target for standard BOS of $0.91 to $0.98 per watt and can improve further" – as First Solar was suffering substantial cost overruns due to BOS and module problems. *See* §§IV.E. and F.

211.   Further, First Solar's manufacturing cost per watt was not $0.75 (and core costs were not $0.73 per watt).  *See* §IV.D.  And, it was misleading for Defendants to assert defective panels were limited to only 4% made during the limited period or that the warranty costs for defective panels was only $41.5 million, when the Company would have to spend over $215 million in connection with defective panels and more for degradation by the end of 2011.  *See* §§IV.B and C.

**August 8, 2011: Pacific Crest Securities Technology Leadership Forum**

212.   On August 8, 2011, First Solar participated in the Pacific Crest Securities Technology Leadership Forum.  Larry Polizzotto represented First Solar.  Polizzotto falsely and misleadingly told investors First Solar was on track to achieve the goals set forth in the Grid Parity Roadmap:

> We also are doing business in an increasing number of countries throughout the world.  Solar has moved from Europe now into India, China, the Middle East, and in Asia.  So, we're participating in all those markets and *we expect that we will achieve grid parity*, which we define as $0.10 to $0.12, by 2014.  And we're doing this through a roadmap of both our module technology as well as our balanced system costs and those things together, we should be able to deliver a complete turnkey system for $0.10 by 2012 -- 2014, excuse me.  *And we are on track for that goal.*
>
> In fact we announced in our earnings call that we're doing better on the balanced system side and *we're going to beat our roadmap* on that and the module side, we are on track for our 2014 goal.  We also

recently announced a record sell which in fact when we implement it ***we will exceed our roadmap efficiencies goals*** which our roadmap efficiency goal today is 14%.  This record sell would enable higher efficiencies than what is in our roadmap today which could mean lower costs in our roadmap.  It also could mean that we enter new markets like some of the rooftop and-or residential space which are markets that we don't play that heavily in today.

213.    Polizzotto continued, linking the achievement of grid parity with a huge new market for First Solar to sell its panels:  "[W]e feel good about our ability to get to grid parity and to be there first.  And, at the end of the day, having that market grow to a terawatt market or more . . . ."

214.    Defendants' statements in the August 8, 2011 Pacific Crest Securities Technology Leadership Forum were materially false and misleading when made for the reasons set forth in §IV.  More specifically, First Solar was not then "on track" to achieving its grid parity goal, nor was First Solar "doing better" on the BOS portion of the Grid Parity Roadmap or "going to beat our roadmap" with respect to the cost per watt to manufacture panels.  *See* §§IV.D., E., and F.

**September 13, 2011: Private Meeting With Gillette**

215.    On September 13, 2011, Plaintiffs met with Defendant Gillette to discuss the Company after the Bank of America/Merrill Lynch Clean Tech Conference in New York City.  During the meeting, Gillette reassured Plaintiffs that First Solar's pipeline of projects in the South West United States would drive profits regardless of cheap panels flooding the market from China and other places.  The pipeline would sustain First Solar's earnings power and gave the Company visibility.  Plaintiffs' investment adviser left this meeting feeling confident that First Solar's earnings power was sustainable and the backlog would last at least three years – until First Solar could produce panels at grid parity.

216.    Gillette also spoke specifically about First Solar reaching grid parity.  Gillette reassured Plaintiffs that First Solar was on track to achieve grid parity.  In particular, Gillette specifically told Plaintiffs (yet again) that if First Solar sold a solar farm for a system cost of $2.25 per watt, this would equate to electricity at $0.10-$0.12

per kilowatt hour – or grid parity.

217.   As set forth at §IV, these statements were false and misleading.  First Solar's pipeline of projects could not sustain the Company's earnings power and the Company would soon be forced to cut earnings forecasts shortly after firing Gillette. Moreover, as First Solar admitted on December 14, 2011, the system cost of $2.25 per watt did not equate to grid parity.  To achieve grid parity, First Solar had to price a system at far less.  As First Solar admitted on December 14, 2011, the Company would have to price systems at $1.40 to $1.60 (excluding owner developmental costs) to be cost competitive.  Because First Solar had to slash its pricing, the Company's margins and earnings were also being slashed.

**October 26, 2011: Third Quarter 2011 Earnings Release**

218.   On October 26, 2011, First Solar issued a press release announcing its third quarter 2011 ("3Q 2011") financial results.  The Company reported net sales of $1 billion and $2.25 diluted EPS for the quarter ended September 30, 2011.  The Company also reported EPS guidance of $6.50 to $7.50 per fully diluted share for the full year.  The press release indicated:

> "First Solar's performance in the quarter reflects our superior technology, strong execution capability, and integrated business model – all of which have enabled us to weather a difficult market environment relatively well," said Mike Ahearn, Chairman of the Board and Interim Chief Executive Officer of First Solar.  "Going forward, our goal is not just to survive the current environment, but to transcend it by creating and expanding markets worldwide that do not depend on today's subsidy programs."

**November 3, 2011: Conference Call**

219.   On November 3, 2011, First Solar hosted a conference call with various securities analysts to discuss the Company's third quarter 2011 financial results. Defendants Ahearn and Widmar participated in this call.

220.   During the call, Defendant Ahearn falsely reported the Company was close to achieving its Grid Parity Roadmap goals:

When we started First Solar in 1999, our mission was to make solar electricity a meaningful part of the electricity supply worldwide and to lead a whole new industry that would be self-sustaining both economically and environmentally.   To accomplish that, we felt we must, as a midterm goal, establish a platform for success and we defined that platform to include:  First, the ability to profitably deliver solar electricity at a price as low as $100 a megawatt hour, which we believe would make solar economical almost everywhere in the world . . . .

Today, much of this platform has been built.  We have reduced module manufacturing cost per watt from $1.59 in 2005, which is our first full year of production, to $0.74 this past quarter.  We're executing a plan to further reduce cost per watt to $0.52 to $0.63 a watt and increase conversion efficiencies from 13.5% to 14.5% by the end of 2014.  We've also built a superior EPC capability where innovative designs and practices combined with scale has enabled us to reduce standard Balance of System cost from $1.56 per watt in 2008 to below $1 per watt today.  And it's provided us with unique insights into the optimization of large power plant performance and reliability.   Over the past year alone, we've reduced our time to build a representative 50 megawatts solar generation plant from 10 months to 7 months, and we're continuing to execute plans to reduce Balance of System cost and cycle times to defined targets through 2014.

* * *

In summary, the platform we set out to build when we started First Solar in 1999 largely exists today.  We're uniquely positioned to move into the next phase from mid-subsidy markets where we've operated in the past to becoming part of the mainstream electricity markets worldwide, which has always been our goal and the reason we formed this company.

So in summary, our operating platform and the tremendous global need for solar power give us confidence that our mission to create enduring value by enabling a world powered by clean, affordable solar electricity is not only vital but more attainable today than it has ever been.

221.   Defendant Widmar also continued to misrepresent the true extent of the excursion defect:

Gross margin was 37.7%, up 1.1 percentage points from the prior quarter.  The increase was prior primarily due to higher ASPs, partially offset by increased manufacturing excursion accruals.   During the quarter, we incurred $22.1 million of additional costs related to the manufacturing excursion that occurred from June 2008 to June 2009. ***We have substantially concluded the remediation programs associated with this manufacturing excursion***. . . .

. . . .The other was an $8.6 million for estimated post sales expenses related to the previously mentioned manufacturing excursion.   It is important to note that we did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed. ***There remains still less than 4% of the modules***

***produced from June 2008 to June 2009***.  Rather, these charges represent a higher than originally anticipated remediation cost and to support our value proposition and to increase customer satisfaction.

222.    Defendants also misleadingly represented that construction was going smoothly at the Agua Caliente solar farm, contrary to the account of CW14. Defendant Widmar stated during the conference call: "In addition to adding to our pipeline, we are making progress in moving forward with existing projects in our pipeline.  At Agua Caliente, we closed the sale to NRG early in the third quarter in conjunction with finalizing a Department of Energy ("DOE") loan guarantee.  We have now completed over 35% of the BOS and [have] installed over 1.4 million modules in Agua Caliente."

223.    Defendant Widmar would also go on to state that First Solar's earnings/revenues were "highlighted by significant construction progress at Agua Caliente."

**November 4, 2011: 3Q 2011 Form 10-Q**

224.    On November 4, 2011, First Solar filed its quarterly report for the quarter ending September 30, 2011 on Form 10-Q.  The Form 10-Q reaffirmed the false financials announced in the October 26, 2011 press release and conference call.  The Form 10-Q was signed by Zhu.

225.    With regards to the manufacturing excursion, Defendants again falsely reassured investors the impact was minimal and properly reserved for:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation.
>
> * * *
>
> We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $22.1 million in expenses accrued during the three months ended September 30, 2011, reflecting

our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

226.    Defendants' statements in the 3Q 2011 Form 10-Q and the October 26, 2011 press release and November 3, 2011 earnings conference call set forth above were materially false and misleading when made for the reasons set forth in §IV. More specifically, the publicly reported financial results were false and misleading for the reasons set forth in §IV.H.  The Company's revised EPS guidance – even though reduced – was still false and misleading for the reasons set forth in §IV.G.

227.    It was also false and misleading for Defendants to assert First Solar was close to achieving grid parity, or that First Solar's BOS costs were less than $1.00 per watt and the cost per watt for module production had dropped to $0.74.  *See* §§IV.D., E., and F.  First Solar manipulated its cost per watt metric, suffered substantial cost overruns that made its theoretical BOS numbers fanciful, and was not close to achieving grid parity.  *Id*.

228.    It was also misleading for Defendants to assert defective panels were limited to only 4% made during the limited period or that the warranty costs for defective panels was only $63.6 million or that the remediation process was "substantially concluded", when the Company would have to spend over $215 million in connection with defective panels and more for degradation by the end of 2011.  *See* §§IV.B and C.

**First Solar Corporate Overview 3Q 2011**

229.    In a presentation to investors given after the third quarter earnings conference call on November 3, 2011, First Solar again falsely reassured Plaintiffs the Company was "confident" in achieving grid parity as set forth in the Grid Parity Roadmap.  Notably, the First Solar Corporate Overview 3Q 2011 presentation again indicated First Solar would achieve grid parity with system pricing of $2.25 per watt. The presentation indicated First Solar's cost per watt was $0.74, and repeated the Company's module manufacturing cost reduction roadmap as originally set forth in the

2009 Grid Parity Roadmap. Similarly, the presentation repeated the Company's balance of system cost reduction roadmap as originally set forth in the 2009 Grid Parity Roadmap.

230. Defendants' statements in the First Solar Corporate Overview 3Q 2011 set forth above were materially false and misleading when made for the reasons set forth in §IV. More specifically, First Solar was not executing on its Grid Parity Roadmap, was not close to achieving grid parity, and First Solar could not achieve grid parity with system pricing of $2.25 per watt, but would have to slash system prices (and margins) to be cost competitive. *See* §IV.F.

## VI. RELIANCE

231. The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of First Solar common stock, which consequently traded at prices in excess of its true value.

232. Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all relevant times, the market for First Solar's common stock was efficient for the following reasons, among others:

a. First Solar common stock met the requirements for listing, and was listed and actively traded on the NASDAQ National Market (symbol FSLR), a highly efficient and automated market;

b. As a regulated issuer, First Solar filed regular reports with the SEC;

c. First Solar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. First Solar was regularly followed by numerous securities analysts employed by major brokerage firms headquartered in the United States and

overseas who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Many of these reports were publicly available and entered the public marketplace;

e.      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of First Solar's securities; and

f.      Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired First Solar common stock between the time that the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of First Solar common stock was artificially inflated by the Defendants' misrepresentations and omissions.

233.   As a result of the foregoing, the market for First Solar common stock promptly reacted to current information regarding First Solar from publicly available sources and reflected such information in the trading price of First Solar common stock. Under these circumstances, a presumption of reliance applies pursuant to the fraud-on-the-market doctrine.

234.   Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market, including the magnitude of First Solar's manufacturing defects, inability to achieve grid parity, and heat-degradation issues, as detailed herein, and other facts concerning First Solar's business.

235.   Plaintiffs also can establish actual reliance.

236.   Plaintiffs, through its investment manager Maverick Capital, Ltd, read, or listened to, and relied on Defendants' materially false and misleading statements alleged herein prior to purchasing First Solar common stock at artificially inflated prices. Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's manufacturing defects,

cost per watt, ability to achieve grid parity, and heat-degradation issues.

237.   Plaintiffs (and their investment manager) recollect, as supported by Plaintiffs' internal documents, that Plaintiffs, through their investment manager Maverick Capital, Ltd., specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein, including the specific false and misleading statements alleged herein, particularly as they concerned First Solar's manufacturing defects, cost per watt, ability to achieve grid parity, and heat-degradation issues, including (i) First Solar's public press releases alleged herein; (ii) First Solar's SEC filings on Forms 8-K, 10-Q and 10-K filed with the SEC during 2008 through the end of 2011, that are alleged herein; and, (iii) First Solar's analyst conference calls concerning quarterly financial results during 2008-2011.

238.   In addition, Plaintiffs, through their investment manager Maverick Capital, Ltd., read and reviewed research analyst reports repeating Defendants' false statements and/or the analysts' communications with Defendants, in which Defendants misrepresented, among other things, First Solar's business practices, including manufacturing defects, cost per watt, ability to achieve grid parity, and heat-degradation issues.

239.   Plaintiffs, through their investment manager Maverick Capital, Ltd., engaged in numerous (tens, if not a hundred) direct communications with Defendants during the relevant period, including direct phone calls, meetings at brokerage houses and hotels for conferences in New York City, and meetings at Plaintiffs' office in New York, during which direct communications Defendants omitted to disclose the truth and other material facts known to them about, among other things, First Solar's manufacturing defects, cost per watt, ability to achieve grid parity, and heat-degradation issues.

240.   Plaintiffs and their investment manager, Maverick Capital, Ltd., are professional investors, who routinely engage in thorough research before purchasing any security and continue to monitor all of their investments through extensive

research.  This research includes review of relevant media, research analyst reports, SEC filings, press releases, conference calls, and any other information source likely to provide important information on the business.  Plaintiffs' investment in First Solar was no different.  Plaintiffs' personal recollection (and that of its investment manager) and internal documents reflect this.

241.   Plaintiffs relied to their detriment on Defendants' materially false and misleading statements and/or the integrity of the market, in purchasing First Solar common stock at artificially inflated prices.   Had Plaintiffs or their investment manager known the truth, Plaintiffs would not have purchased the securities.

## VII.   LOSS CAUSATION

242.   As detailed herein, Defendants engaged in a scheme to mislead investors with respect to, among other things: (i) known defects in First Solar's panels and manufacturing processes; (ii) panel degradation rates, including heat degradation; (iii) First Solar panels' cost per watt to generate electricity; (iv) massive cost overruns at First Solar's utility scale projects, and the profitability of such projects in First Solar's pipeline; (v) First Solar's efforts to achieve grid parity; and (iv) the impact of these matters and an oversupply of cheap panels on First Solar's business and First Solar's ability to achieve earnings targets.

243.   Defendants, like most perpetrators of fraud, did not simply admit to their fraudulent conduct all at once.  Rather, the truth concerning First Solar's false and misleading statements came to light in bits and pieces.

244.   Beginning on August 17, 2011, the first of a series of partial disclosures revealing Defendants' fraudulent scheme and its implications for First Solar emerged. The disclosures of Defendants' fraudulent scheme, and the market's understanding of the resulting and foreseeable consequences of Defendants' scheme caused First Solar's stock price to decline precipitously and Plaintiffs were damaged as a result.   The decline caused Plaintiffs economic harm.

245.   While Defendants' false and misleading statements benefitted First Solar

63

and the Individual Defendants, the scheme exposed Plaintiffs to foreseeable and material undisclosed risks that, among other things: (i) First Solar would be forced to incur massive expenses to replace and/or fix defective panels/modules; (ii) First Solar would be forced to over-build solar farms to be able to supply the amount of power required by the PPA, impacting the profitability of each project; (iii) First Solar would be unable to convert projects in its pipeline into profit as investors had been led to believe; (iv) First Solar would be unable to win DOE loan guarantees; (v) the Company's aggressive accounting would be exposed; (vi) First Solar's forecasted earnings would be unachievable due to competition from other solar panel manufacturers; (vii) the integrity of Company management would be challenged and senior executives terminated; and (viii) investors would realize First Solar could not compete with traditional forms of electricity production without significant government subsidies.  These material risks and others – which were the foreseeable result of Defendants' fraudulent scheme to fraudulently inflate the price of First Solar stock – materialized and caused the market value of First Solar common stock to decline to the detriment of Plaintiffs.

246.   First Solar's false and misleading statements, individually and collectively, concealed First Solar's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about First Solar was revealed.

247.   As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs purchased First Solar common stock at prices far exceeding its true worth.

248.   First Solar shareholders, including Plaintiffs, were injured when the truth began to be revealed and it became apparent that First Solar could not deliver the quality and/or cost-effective solar panel products they had previously indicated.

249.   As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs have been

damaged by their purchase of First Solar common stock.

250.    Defendants' false and misleading statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiffs, and maintained the artificial inflation in the price of First Solar common stock until the truth was revealed to the market through the following series of disclosures.

251.    On August 17, 2011, First Solar announced its former CFO and then-head of the utility systems business, Jens Meyerhoff, was leaving the Company. This was unexpected. In light of the recent departure of Defendant Sohn on April 30, 2011, the Company's stock price declined precipitously as investors began to voice concerns about departures being due to hidden problems. The stock immediately traded down over $7.00 per share, before closing down $5.00.

252.    On September 16, 2011, Axiom Capital's Gordon Johnson issued an analyst report accusing First Solar of issuing misleading financial results and using aggressive accounting. The report, titled "Fools Gold", quotes Abraham Lincoln in the introduction: "'***You can fool some of the people all of the time, and all of the people some of the time, but you cannot fool all of the people all of the time***.'" Based, in part, on his communications with one of FSLR's "largest customers", Axiom reported that it believed First Solar's revenues on panel sales were lower than the market expected – but First Solar was using "***aggressive accounting***" and other one-time gimmicks to make the Company's reported financial results look better than they really were. Indeed, ***Axiom accused First Solar of having "adopted an [accounting] approach so convoluted that, in our opinion, it is misleading."*** Axiom also accused First Solar "pulling forward one-time future profits to make the current year in a way that we [believe] was not planned when the company gave original CY11 guidance" – and doing so to hide "the deterioration year-to-date (YTD) in FSLR's core business of selling modules."

253.   Further, Axiom wrote:

> With the aforementioned as a backdrop, we are moving our targeted price-target range to 24 months vs. 12 months prior, & adjusting our 24-month price objective on FSLR to $35/share vs. $75/share previously. Inspiring our report's title, "*Fools Gold*", we believe while FSLR's "creative" percentage-of-completion accounting may allow for continued aesthetic EPS upside vs. the Consensus ests through CY11 & possibly CY12, we also believe "real" organic earnings have begun to deteriorate materially (evidenced by C2Q11 EPS of $0.70/shr, or $2.80/shr annually, which excludes project revenue percentage-of-completion contributions), & expect this to become crystal clear to investors through CY11 & in CY12 via material cash erosion.  FSLR is now our top short pick in the solar space as we believe the bulk of both sell-side & buy-side analysts on the Street are mis-modeling the company, suggesting as the items we touched on above become more well understood by the "pundits", FSLR's forward valuation multiple should moderate materially.

254.   As a result of the Axiom report partially disclosing First Solar's use of aggressive accounting to hide deteriorating financial performance, First Solar's share price dropped from a close of $90.56 on September 15, 2011, to a close of $85.70 on September 16, 2011 – a drop of $4.86, or 5.4%.

255.   On September 21 and 22, 2011, investors learned that First Solar would not be receiving federal loan guarantees for First Solar's Topaz solar farm.   The information was first leaked to select investors, and then First Solar issued a press release to the public.   First Solar refused to provide a clear explanation for why it failed to win the loan guarantees, merely stating that First Solar could meet the government's deadlines for submitting the required information.   Though First Solar refused to provide details on why it failed to win the federal guarantees, the news raised questions about the validity of First Solar's business model and Defendants' public statements concerning the strength of First Solar's utility-scale business.   As a result, First Solar's share price dropped from a close of $79.21 on September 20, 2011, to a close of $66.85 on September 22, 2011 – a drop of $12.36, or 15.6%.

256.   On September 28, 2011, Cantor Fitzgerald issued an analyst report cutting its share price target for First Solar from $88 to $55.  While Cantor Fitzgerald continued to believe in First Solar's efforts to reach grid parity ("First Solar remains

well positioned to flourish in a market with low or no subsidies."), Cantor Fitzgerald warned investors that the rest of 2011 and 2012 would be well below First Solar's forecasts due to an oversupply of panels worldwide.  Defendants had been warned about this glut of panels, but refused to factor it into First Solar's earnings guidance. *See* §IV.G.  As a result of the market realizing First Solar's business would be impacted by the worldwide oversupply of panels, First Solar's share price dropped from a close of $72.27 on September 27, 2011, to a close of $64.75 on September 28, 2011 – a drop of $7.52, over 10.4%.

257.   On October 25, 2011, First Solar issued a press release – during the middle of the trading day – announcing that it had replaced CEO Gillette with Defendant Ahearn on an interim basis.  This was a shocking announcement, and highly unusual.  Press reports indicated that the Board of Directors ousted Gillette.  Investors, suspecting fraud or major operational problems, fled from First Solar's stock.   As Ahearn later admitted: "I know there's been a lot of speculation about whether there was some type of fraud or legal action or government investigation or major operational problem behind the move . . . ."

258.   On October 25, 2011, a Morgan Stanley analyst wrote: "Impact on our views: We believe that Robert Gillette's unexpected departure is likely a troubling sign of things to come. . . .  We believe the uncertainty regarding the departure and the abrupt nature of the announcement will lead to negative speculation regarding the Company's fundamentals."  The same day, a Deutsche Bank analyst wrote: "[W]e believe the news (along with timing of announcement) is likely to raise a lot of investor questions about the health of overall industry as well as near/longer term profitability outlook of the company."  A trio of Credit Suisse analysts called the news "quite concerning" and wrote: "we have never quite seen a CEO departure announced in this manner in our universe."

259.   As a result of Gillette's sudden termination, coupled with concerns of fraud and/or other major problems at the Company, First Solar's share price dropped

from a close of $57.95 on October 24, 2011, to a close of $43.27 on October 25, 2011 – a drop of $14.68, over 25.3%.

260.   On December 14, 2011, First Solar issued a press release announcing its updated fiscal 2011 financial guidance.   The Company again slashed its 2011 guidance, forecasting net sales in the range of $2.8 to $2.9 billion, diluted EPS of $5.75 to $6.00 and operating income of $575 to $600 million.   The Company's reduced 2011 guidance was attributable to massive charges for defective products that the Company would be forced to incur, and the other problems outline herein.

261.   Additionally, on December 14, 2011, the Company disclosed facts sufficient for Plaintiffs and others to discern that First Solar was not on track to achieve grid parity as set forth in the Grid Parity Roadmap.   Among other things, First Solar revealed for the first time that to reach grid parity First Solar would have to slash its operating margins to just 8-12%, and price its systems at $1.40 to $1.60 per watt. This was far below the system cost of $2.00 to $2.50 per watt, and 20-25% operating margins, Defendants had repeatedly told investors in the Grid Parity Roadmap in 2009, and repeatedly confirmed throughout the relevant period up until November 2011 in the Company's Corporate Overview, as set forth in ¶229.

262.   Plaintiffs and other investors were shocked by the December 14, 2011 disclosures – which were clearly contrary to what Defendants had been telling investors.   When questioned by Plaintiffs over these significant inconsistencies, Defendants could provide no meaningful explanation.   Accordingly, and as a direct result of the December 14, 2011 disclosures, Plaintiffs began selling their significant holdings in First Solar stock.

263.   As a further result of First Solar's December 14, 2011 disclosures, First Solar stock dropped $9.12 per share to close at $33.45 per share, a one-day decline of 21% on volume of over 17 million shares.   The stock price continued to decline the next day by another $2.00.   These declines removed artificial inflation from First Solar's stock price, causing Plaintiffs' losses.

264.   On February 10, 2012, First Solar shares declined in reaction to news that First Solar's Antelope Valley Solar Ranch One project had been delayed. According to an *Associated Press* article titled "First Solar shares plunge on project delay," First Solar had been unable to resolve permitting issues.  First Solar shares fell by $5.12, or 10.4%, to close at $43.91.  According to CW9, inspectors at Antelope Valley Solar Ranch were concerned about how First Solar's panels performed in high heat. *See* ¶¶73-74.

265.   On February 28, 2012, First Solar announced a net loss of $413 million, or ($4.74) diluted EPS for 4Q 2011 and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609 million, for the same period the year before.  For the year 2011, First Solar reported a net loss of $39.5 million, or ($0.46) diluted EPS and revenue of $2.8 billion, as compared to net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion for the same period the year before.

266.   Significantly, on February 28, 2012, First Solar admitted to heat degradation problems and admitted the excursion had a much larger impact on the Company's financials than had been previously indicated.  First Solar took a $37.8 million charge related to heat degradation, and increased the excursion related expenses by $125.8 million to $215.7 million.  Though not indicated at the time, these increased warranty expenses had a substantial impact on the Company's 4Q 2011 financial results and guidance previously reported on December 14, 2011.

267.   The media and analysts noted the staggering charge taken by the Company associated with replacing defective panels.  *Bloomberg News* noted that in the fourth quarter, the problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims."  *The Wall Street Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty."  Mark Bachman, an analyst at Avian Securities

LLC, noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."  In his February 29, 2012 report titled "A quarter billion dollar warranty problem," Credit Suisse analyst Satya Kumar emphasized that "[t]he $253mm in cumulative warranty and related charges now raises a significant question mark on the reliability and field performance of FSLR's panels – product quality in our view is THE MOST SIGNIFICANT metric for a solar companies' long-term survivability."  (Emphasis in original.)

## VIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

268.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions.  To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements.  Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of First Solar who knew that the statement was false when made.  Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

1

2

## IX.   DEFENDANTS' FRAUDULENT SCHEME ENCOMPASSED CONDUCT MORE THAN MERE MISREPRESENTATIONS AND OMISSIONS

3

4

5

6

7

8

9

269.   Defendants did not merely lie to investors and the public.  As a further part of the undisclosed scheme, Defendants caused First Solar to sell and install technologically flawed and defective solar panels, and to take affirmative steps to conceal these defects and technological flaws from customers and the public at large. Defendants schemed and took affirmative steps to conceal the true economic viability and technological efficiency of the Company's products so as to perpetuate the false belief that First Solar was close to achieving grid parity.

10

11

12

13

14

270.   For example, as part of the fraudulent scheme to artificially, and in the short term, inflate First Solar's stock price, Defendants caused First Solar employees to repeatedly ship defective solar panel modules to customers even though First Solar had previously determined the modules failed to satisfy First Solar's own requirements. *See supra* ¶¶40-49.

15

16

17

18

19

271.   Further, Defendants created and enforced rules (a) imposing quotas that limited the number of modules that could be marked as defective by First Solar employees (*see supra* ¶46), (b) relaxing, to commercially unreasonable levels, the standards for acceptable modules (*see supra* ¶46), and (c) labeling modules with a higher wattage than the panels would produce after degrading (*see supra* ¶80).

20

21

22

23

24

272.   These defective and technologically flawed modules were an undisclosed problem for First Solar. Defendants implemented policies requiring strict confidentiality by employees who were familiar with these issues.  Further, Defendants caused the Company's employees dealing with the public to conceal the true nature of these problems.  *See supra* ¶¶35-36, 72, 76, 97.

25

26

27

28

273.   Similarly, Defendants hid from investors the true economic viability and efficiency of First Solar's technology by secretly taking drastic measures to compensate for the low energy production of the Company's modules.  Defendants caused First Solar to overbuild facilities (*i.e.,* add rows of extra solar panels to the solar

71

farms it constructed) because the Company's projected power output was never as high as it was supposed to be. Further, Defendants caused the Company to utilize expensive capacitor banks and customized inverters – again to compensate for defects and heat degradation found in the Company's modules. *See supra* ¶¶58, 69, 70, 80-82.

274. By secretly using additional rows of solar panels, expensive inverters and capacitor banks, Defendants misleadingly made it appear the Company's solar panel modules were more economical, efficient and technologically advanced than was in fact true, and concealed from the public the true economic viability of the Company's technology. These actions further concealed the fact that First Solar was not anywhere close to actually obtaining grid parity. *See supra* ¶¶111-118.

## X.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Against Defendants for Violations of
### §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

275. Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

276. The Individual Defendants and First Solar, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of First Solar, as specified herein.

277. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for First Solar common stock in violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

278. Defendants also: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of First Solar's

common stock; and (iii) caused Plaintiffs to purchase First Solar's common stock at an artificially inflated price.

279.  The Individual Defendants' primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iv) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

280.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of First Solar's publicly disseminated information.  The Individual Defendants were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

281.  Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing First Solar's adverse operating condition and financial condition – including known defects with panels, panel-degradation, manipulation of the cost per watt metric, GAAP violations, and the inability to reach grid parity – from the investing public.  These false statements and

omissions supported the artificially inflated price of First Solar securities.  As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

282.   As a result of the fraudulent activities of Defendants described above, the market price of First Solar common stock was artificially inflated.  In ignorance of the fact that the market price of First Solar common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which First Solar common stock traded at the time when such statements were made, Plaintiffs acquired First Solar common stock at artificially high prices and was damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from First Solar common stock.   At the time of the alleged misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed the false statements to be true.  Had Plaintiffs known the true nature of the operations of First Solar and the true facts alleged herein, Plaintiffs would not have purchased or otherwise acquired First Solar common stock.

283.   Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein.

284.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for First Solar common stock was an efficient market. First Solar common stock was listed and actively traded on a highly efficient and automated market; First Solar filed periodic public reports with the SEC; First Solar was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, First Solar regularly issued press releases, which were carried by national and international news wires, and which were publicly available

and entered into the public marketplace. As a result, the market for First Solar equity securities promptly digested current information regarding First Solar from all publicly-available sources and reflected such information in the First Solar common stock price.

285. Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' scheme, including: the magnitude of First Solar's manufacturing defects, inability to achieve grid parity, and heat-degradation issues, as detailed herein, and other facts concerning First Solar's business.

286. The market prices for First Solar common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

287. As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of First Solar common stock.

288. By virtue of the foregoing, Defendants violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

### SECOND CAUSE OF ACTION
### Against The Individual Defendants for Violations of
### §20(a) of the Securities Exchange Act of 1934

289. Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

290. The Individual Defendants acted as controlling persons of First Solar within the meaning of §20(a) of the Securities Exchange Act of 1934. By virtue of their positions with the Company, and ownership of First Solar stock, the Individual Defendants had the power and authority to cause First Solar to engage in the wrongful conduct complained of herein. First Solar controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Securities Exchange Act of 1934.

**THIRD CAUSE OF ACTION**
**Against Defendants for Common Law Fraud**

291.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

292.    As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about First Solar, its business practices, and its financial condition.

293.    In addition, the Defendants conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding First Solar's financial condition and prospects, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

294.    The aforesaid misrepresentations and omissions by the Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

295.    The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under common law.

296.    Plaintiffs reasonably relied upon the Defendants' misrepresentations when deciding to purchase First Solar's common stock, and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

297.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered damages in connection with its purchase of First Solar common stock.

298.    Defendants' fraud and deceit was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only Plaintiffs, but the investing public.  As a result, Defendants should be required to pay punitive damages to Plaintiffs.

**FOURTH CAUSE OF ACTION**
**Against All Defendants for Violation of A.R.S. §§44-1991(A)(2)-(3) & 44-2003(A)**

299.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

300.   This claim is brought against all Defendants for civil liability under A.R.S. §44-2003(A) for their violations of A.R.S. §§44-1991(A)(2) and (A)(3).

301.   Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of First Solar, as specified herein.  Defendants knew or recklessly ignored that disclosure of First Solar's true business condition would reduce the value of First Solar's stock.

302.   The course of business through which Defendants fraudulently operated First Solar and disclosed information about First Solar without disclosing the misstatements alleged herein violated A.R.S. §§44-1991(A)(2) and (A)(3).

303.   First Solar and the Individual Defendants culpably made, participated in, or induced the sales to Plaintiffs of First Solar's stock while violating  A.R.S. §§44-1991(A)(2) and (A)(3).   Under A.R.S. §44-2003(A), First Solar and the Individual Defendants are jointly and severally liable for their violations of §§44-1991(A)(2) and (A)(3).

304.   Because of the securities violations described in this claim, Plaintiffs are entitled to, and by this Complaint demand, actual damages, rescissionary damages, or rescission under A.R.S. §44-2001(A).

305.   Plaintiffs tender to Defendants all stock, substituted stock, or consideration received (or substituted) in connection with the securities that Plaintiffs purchased.  Further, Plaintiffs offer to do any other acts necessary for rescission or rescissionary damages under A.R.S. §44-2001(A).   In return, Plaintiffs demand rescission or rescissionary damages with interest and attorney fees as provided in

A.R.S. §44-2001(A).

## FIFTH CAUSE OF ACTION
### Against The Individual Defendants for Violation of A.R.S. §§44-1999(B)

306.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

307.   Individually or as a group, or both, the Individual Defendants were statutory control persons with the power to control First Solar.

308.   With respect to First Solar's violations of A.R.S. §§44-1991(A)(2) and (A)(3), the Individual Defendants are jointly and severally liable to Plaintiffs as controlling persons of First Solar under A.R.S. §44-1999.

309.   Because of the securities violations described in this claim, Plaintiffs are entitled to, and by this Complaint demand, actual damages, rescissionary damages, or rescission under A.R.S. §44-2001(A).

## SIXTH CAUSE OF ACTION
### Against All Defendants for Negligent Misrepresentation Under New York Common Law

310.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this claim, Plaintiffs assert only negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

311.   First Solar had a legal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

312.   The Individual Defendants, as officers and directors of First Solar, had a legal duty to report accurate information concerning the Company's business operations so that information could be reported to shareholders and/or had a personal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

313.   Plaintiffs were wholly without knowledge of Defendants' fraudulent

scheme, and could not reasonably have been expected to know of such practices, and sought assurances from Defendants with regards to First Solar's ability to achieve grid parity, earnings sustainability in light of global panel pricing, defects and other matters asserted herein.  Defendants had exclusive knowledge of the facts concerning the Company's progress to grid parity, pricing for solar farms, and the number and impact of problems related to solar panel and manufacturing defects, including degradation. Defendants repeatedly, both publicly and in person, reassured Plaintiffs there were no material problems and that the Company was executing on its Grid Parity Roadmap. These conversations constituted a special relationship between the parties.

314.   Defendants made and/or caused to be made false and misleading statements to shareholders, including Plaintiffs, concerning, among other things, First Solar's business practices, as alleged herein.

315.   Defendants acted negligently in making their statements to shareholders, including Plaintiffs, which were false and misleading.

316.   Defendants' false and misleading statements to shareholders, including Plaintiffs, concerning First Solar's business, were made for a serious purpose, and Defendants knew that shareholders, including Plaintiffs, desired this information for a serious purpose, *i.e.*, to make multi-million dollar investment decisions.

317.   Plaintiffs intended to rely and act upon Defendants' false and misleading statements, and did in fact reasonably rely upon Defendants' false and misleading statements to Plaintiffs' detriment.

318.   The market prices for First Solar common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

319.   The market prices for First Solar common stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized.

320.   As a direct and proximate result of the alleged wrongful conduct,

Plaintiffs suffered damages in connection with their purchase of First Solar common stock.

**XI.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Requiring Defendants to provide rescission or to pay rescissionary damages or actual damages sustained by Plaintiffs by reason of the acts and transactions alleged herein.

B.    Requiring Defendants to pay punitive damages for their violations of common law fraud and by reason of the acts and transactions alleged herein.

C.    Awarding Plaintiffs prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as their reasonable attorneys' fees, expert fees and other costs.

D.    Awarding such other and further relief as the Court may deem just and proper.

**XII.    JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury.


Dated:  June 23, 2015.

**TIFFANY & BOSCO, P.A.**


By:    */s/ Richard G. Himelrick*
      Richard G. Himelrick
      J. James Christian
      Seventh Floor Camelback Esplanade II
      2525 East Camelback Road
      Phoenix, AZ 85016
      Telephone: (602) 255-6000
      rgh@tblaw.com; jjc@tblaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DIETRICH SIBEN THORPE LLP**
Matthew P. Siben
500 Australian Ave. South, Suite 637
West Palm Beach, Florida 33401
Telephone: (561) 820-4882
matthew@dstlegal.com

- and -

David A. Thorpe
9595 Wilshire Blvd., Suite 900
Beverly Hills, California 90212
Telephone: (310) 300-8450
david@dstlegal.com

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

       *s/ Shelley Boettge*
       Shelley Boettge