1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8    Maverick Fund, L.D.C.; Maverick Fund          No. CV15-1156-PHX-DGC
     USA, Ltd.; Maverick Fund
9    USA, Ltd.; Maverick Fund II, Ltd.,            **ORDER**
     Maverick Neutral Fund, Ltd.; Maverick
10   Neutral Levered Fund, Ltd.; Maverick Long
     Fund, Ltd.; and Maverick Long Enhanced
11   Fund, Ltd.,

12                        Plaintiff,

13   v.

14   First Solar, Inc.; Michael J. Ahern; Robert
     J. Gillette; Mark R. Widmar; Jens
15   Meyerhoff; James Zhu; Bruce Sohn; and
     David Eaglesham
16
                         Defendants.
17

18          Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd.,

19   Maverick Neutral, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund,

20   Ltd., and Maverick Long Enhanced Fund, Ltd. ("Maverick" or "Plaintiffs") sued First

21   Solar, Inc., Michael Ahearn, Robert J. Gillette, Mark R. Widmar, Jens Meyerhoff, James

22   Zhu, Bruce Sohn, and David Eaglesham (collectively "Defendants") for violations of

23   federal and state securities laws, common law fraud, and negligent misrepresentation.

24   Doc. 1.  Defendants move to dismiss under Rule 9(b) and 12(b)(6), and under the Private

25   Securities Litigation Reform Act, 15 U.S.C. § 78u et. seq. ("PSLRA").  Doc. 17.  The

26   motions are fully briefed, and oral argument will not aid the Court's decision.  *See* Fed.

27   R. Civ. P. 78(b); LRCiv 7.2(f); Docs. 17, 20, 21.  For the reasons that follow, the Court

28   will grant Defendants' motion in part, and deny in part.

I.       **Background.**

The Court accepts Plaintiff's factual allegations as true for purposes of this motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This case has been stayed pending an interlocutory appeal to the Ninth Circuit that took more than two years to resolve. As a result, allegations in the complaint are a bit dated, but nonetheless appear to be relevant to the claims asserted in this case.

A.       **The Parties**.

Plaintiffs are private investment funds managed by non-party Maverick Capital, Ltd. Doc. 1 ¶ 14. Defendants are First Solar, Inc. and individuals who served managing roles for First Solar over the last ten years. First Solar designs and manufactures solar panel modules. Doc. 1 ¶ 17. Defendant Ahearn founded First Solar and serves as chairman of the board of directors. *Id.* ¶ 18. Defendant Gillette served as First Solar's CEO until his resignation on October 25, 2011. *Id.* ¶ 19. Defendant Widmar served as First Solar's chief financial officer ("CFO") from April 2011 through the "remainder of the relevant period into 2012." *Id.* ¶ 20. Defendant Meyerhoff served as First Solar's CFO until December 2010 and as president of the utility systems business group until August 17, 2011. *Id.* ¶ 21. Defendant Zhu served as the interim CFO from June 2007 to October 2009 and then as First Solar's chief accounting officer until January 2012. *Id.* ¶ 22. Defendant Sohn was First Solar's president of operations until April 30, 2011. *Id.* ¶ 23. Defendant Eaglehsam was the chief technology officer from November 2009 to May 2012. *Id.* ¶ 24.

B.       **Factual Allegations.**

Between May 4, 2011 and December 15, 2011, Plaintiffs purchased millions of First Solar common stock. *Id.* ¶ 16. Plaintiffs purchased these shares relying on Defendants' misrepresentations that First Solar would reach grid parity through advanced technology and large scale solar power plants in the southwest.[1] *See Id.* ¶¶ 15, 215, 236.

---

[1] Grid parity is the point where the production and sale of solar energy is competitive with the production and sale of conventional energy. *See Changzhou Trina*

Plaintiffs also relied on statements by Defendants that although Defendants experienced problems with defective and underperforming panels throughout 2009 to 2011, the problems were minimal and would not affect First Solar's earnings or grid parity goals. Doc. 1 ¶ 215, 236.

Beginning in 2009, First Solar announced a plan to reach grid parity by 2010-2012. Doc. 1 ¶¶ 101-02. Eaglesham, Sohn, Ahearn, and Meyerhoff presented a detailed Grid Parity Roadmap at First Solar's 2009 annual analyst and investor meeting. *Id.* ¶ 103. The plan involved reducing First Solar's cost per watt (CpW) by reducing module costs, reducing balance of system costs, and then building and selling large scale solar power farms at a "huge margin on each watt of electrical production capacity built and sold." *Id.* ¶¶ 103-04. After reaching grid parity, demand for solar panels would soar, allowing First Solar to maintain healthy gross and operating margins. *Id.* ¶ 103.

To lower its CpW, First Solar initiated construction of several large scale solar power plants in the southwest. *See* Doc. 1 ¶ 102, 170, 179, 220. In 2010-2011, First Solar became aware that the plants were not producing the quantity of energy projected due to poor performance in high heat environments. *See* Doc. 1 ¶¶ 56, 67, 80, 91.

In July 2010, First Solar released a statement that it had a "manufacturing excursion" from June 2008 to June 2009. Doc. 1 ¶ 29. According to First Solar's release, four percent of the modules produced during that period could experience premature power loss. *Id.*

On several occasions from 2010 to 2011, First Solar announced robust earnings projections, positive expectations for construction of solar power plants, reduction of CpW, and progress on achieving grid parity. *See* Doc. 1 ¶¶ 147, 149, 153, 157, 160, 162, 170-71, 178, 185-91, 197-205, 209, 212, 220-22, 229. During these announcements, Defendants also said that they were remedying the manufacturing excursion and that its effect continued to be minimal. *See id.* ¶¶ 150, 177, 193, 221, 225. Defendants never

*Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 879 F.3d 1377, 1384 (Fed. Cir. 2018).

mentioned issues involving panel performance in high heat environments or possible heat degradation in panels. *Id.* ¶ 185.

On September 13, 2011, Plaintiffs met with Gillette to discuss First Solar. *Id.* ¶ 215. Gillette assured Plaintiffs that the projects in the southwest would drive profits despite cheap imports from China. *Id.* Gillette also reassured plaintiffs that First Solar was on track to achieve grid parity. *Id.* ¶ 216.

Over the second half of 2011, First Solar made several announcements regarding high-level executives leaving the company and delays in construction of solar power plants, which caused the stock value to dip. *See* Doc. 1 ¶¶ 251-59. In late 2011, First Solar reduced its earnings projections and announced that it would have to slash its operation margins to achieve grid parity. Doc. 1 ¶¶ 260-61. By the beginning of 2012, First Solar announced a net loss of $39.5 million for 2011, an additional $125.8 million warranty reserve cost for the manufacturing excursion, and an additional $37.8 million for handling heat degradation issues in panels. Doc. 1 ¶ 266. The excursion warranty charges in the fourth quarter represented more than half of the total warranty charges incurred. *Id.* ¶ 267. This was also the first release to include a charge for heat degradation effects. *Id.* ¶ 266. As a result of these announcements, Plaintiffs' stock value dropped precipitously. Doc. 1 ¶ 263.

## C. The Complaint.

Plaintiffs allege that they purchased First Solar common stock and suffered substantial losses after relying on Defendants' false and misleading statements. Doc. 1 ¶ 15. Plaintiffs allege that Defendants concealed the existence and severity of known defects in First Solar's panels; (*id.* ¶ 28) Defendants misrepresented panel degradation rates and concealed heat-related problems with panels and systems (*id.* ¶ 16); Defendants manipulated their CpW metric reported to investors (*id.* ¶ 24); Defendants concealed cost overruns and misrepresented the value of the First Solar's projects (*id.* ¶ 90); Defendants falsely described First Solar as close to reaching grid parity (*id.* ¶ 101); Defendants knew there would be an oversupply of cheap panels in the market, but refused to adjust

earnings forecasts accordingly (*id.* ¶ 120); and Defendants issued false financials and violated the Generally Accepted Accounting Principles ("GAAP") (*id.* ¶ 128).

Plaintiffs allege six causes of action: (1) violation of § 10(b) of the Securities Exchange Act of 1934 (*id.* ¶ 275); (2) violation of § 20(a) of the Securities Exchange Act of 1934 (*id.* ¶ 289); (3) common law fraud (*id.* ¶ 291); (4) violation of A.R.S. § 44-1991(A)(2)-(2) and A.R.S. § 44-2003(A) (*id.* ¶ 299); (5) violation of A.R.S. § 44-1999(B) (*id.* ¶ 306); and (6) negligent misrepresentation under New York common law (*id.* ¶ 310).

## II. Plaintiffs' § 10(b) Claim.

Defendants argue that Plaintiffs' § 10(b) claim should be dismissed for three reasons. Doc. 17. First, Plaintiffs failed to plead that Defendants made actionable false or misleading statements. *Id.* at 10. Second, Plaintiffs have not pled sufficient facts to establish loss causation. *Id.* at 12. Third, Plaintiffs have not pled sufficient facts to establish scienter. *Id.* at 15. The Court will address each argument in turn.

### A. Pleading Standard.

To avoid a Rule 12(b)(6) dismissal, the complaint must plead enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To allege fraud with particularity, a [claimant] . . . must set forth an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994).

Securities claims must also meet the heightened pleading requirements of the PSLRA. 15 U.S.C. § 78u-4(b)(1-2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007). When plaintiffs allege misleading statements or omissions, the PSLRA requires that the complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs must also "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

**B.      Elements of 10b-5 Claim.**

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Janus Capital Group, Inc.*, 131 S. Ct. 2296, 2301, n.3 (2011); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

**C.      False Statements.**

Defendants argue that Plaintiffs fail to plead actionable false statements for three reasons: (1) Defendants' grid parity statements are too generalized and conclusory to state a claim under the PSLRA; (2) Defendants' statements are inactionable "forward-looking" statements (3) Defendants' statements are "merely vague statements of optimism and feel good monikers that are not actionable." Doc. 17 at 4-6.

To plead falsity, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Statements must be pled with specificity to say how and why they are false. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1086 ("[A]lthough the complaint alleges that over the fifteen-month class period, [defendant] continually and deliberately mislead investors by stating that its sales-cycle was 'holding steady at three to six months,' much of the complaint fails to allege any facts to indicate why this statement would have been misleading at the several points at which it was alleged to have been made."); *Ronconi v. Larkin*, 253 F.3d 423, 429-32 (9th Cir. 2001).

/ / /

### 1. Plaintiffs' General Allegations.

Plaintiffs allege, based on confidential witnesses and circumstantial evidence, that Defendants knew the manufacturing excursion would be more extensive than they reported. Doc. 1 ¶ 32. After First Solar's manufacturing excursion release, Defendants assured investors throughout 2010 and 2011 that the manufacturing excursion was limited, First Solar had adequate reserves to cover defective panels, and panels were reliable and of the highest quality. Doc. 1 ¶¶ 29, 31, 142, 154, 182, 193. Defendants "repeatedly and falsely" stated that First Solar took corrective action and nearly remediated all of the defective panels. *Id.* ¶ 31, 177, 221, 225. But Plaintiffs allege that Defendants knew the rate of decline for the panels was more than originally predicted and more than First Solar told its customers. *Id.* ¶¶ 75-76; *see also id.* ¶ 79. In July 2010, Defendants falsely stated that it would cost $23.4 million to fix the defective panels, but, by the end of 2011, the remediation costs had reached $215 million. *Id.* ¶ 32.

Plaintiffs allege, based on confidential witnesses and circumstantial evidence, that First Solar knew about the panels' high-heat-performance issues and possible heat degradation before reporting issues in 2012. Doc. 1 ¶ 54. Confidential witness eight ("CW 8") stated that First Solar's senior executives received regular reports about the degraded and damaged panels and were well aware of the problem by the third quarter of 2011. *Id.* ¶ 72; *see also* ¶ 38 (Confidential witness two ("CW 2") stated that individually named defendants – Gillette, Ahearn, and Sohn – received defect reports noting "anything significant."). Confidential witnesses three and four ("CW 3" and "CW 4") stated that the company developed a protocol for dealing with defective panels as early as late 2009 to early 2010. Doc. 1 ¶¶40-46. CW 4 stated that every time a panel was defective its bar code went into a computer system so that it could be tracked. *Id.* ¶ 47.

Plaintiffs allege that First Solar concealed the damaged and defective panels. *Id.* ¶ 28. Confidential witness one ("CW 1"), who worked as a First Solar global supply quality engineer, indicated that First Solar went to great lengths to keep all known defects in the panels from being revealed to the public. *Id.* ¶ 33. CW 1 was specifically told to

keep confidential any of the personally witnessed defects with the solar panels.  *Id*. ¶¶ 33-35.  CW 3 described defective modules set aside but then later shipped to customers.  *Id*. ¶ 44.  Plaintiffs maintain that the extent to which the company tracked and managed these defective panels demonstrates First Solar's awareness and concealment of the issue.

Plaintiffs allege that the panels' heat degradation issues impacted First Solar's ability to build profitable solar power plants in the southwest, leading to First Solar's 2011 publicly reported poor economic performance and affecting First Solar's grid parity progress.  Doc. 1 ¶¶ 53, 83.  Plaintiffs further allege that First Solar knew about this effect, but continued to represent the projects as performing as expected and on track to achieve grid parity.  Doc. 1 ¶ 90; *see, e.g.*, ¶¶ 149, 164, 168, 173.  Confidential witness seven ("CW 7") investigated significant cost overruns from the end of 2010 throughout 2011.  *Id*. ¶ 91.  CW 7 reported directly to a senior finance manager, who reported serious cost overruns to First Solar's CEO Gillette.  *Id*.  And employees were told not to share information about cost overruns with the public.  *Id*. ¶ 97.

Plaintiffs further allege, based on information from CW 2, that Ahearn, Gillette, Meyerhoff, Zhu, and Widmar were personally and regularly involved in heat-related problems at First Solar's El Dorado plant from 2009 to 2010.  *Id*. ¶ 55.  El Dorado's heat-related problems were not disclosed to the investing public during quarterly report calls.  *Id*. ¶ 59.  Confidential witness five ("CW 5"), a First Solar development engineer, also indicated that the solar power farms failed to meet promised wattage commitments during his 2009 to 2011 tenure.  *Id*. ¶¶ 60-61.  According to CW 5, these issues were reported to First Solar's senior management.  *Id*.  In September 2010, CW 5 presented the data from the solar farms at First Solar headquarters.  *Id*. ¶ 63.  First Solar's "high-level executives" asked for the meeting.  *Id*. ¶ 64.  Plaintiffs allege that concerns over these panel issues held up construction of the Antelope Valley solar farm.  *Id*. ¶¶ 73-74.

Plaintiffs allege that beginning in late 2010 and throughout 2011, Defendants repeatedly made false and misleading statements about First Solar's grid parity progress.  *See, e.g. id.* ¶¶ 170-75, 183, 188, 195, 199, 201.  In December 2010, Defendants stopped

talking about grid parity in the future tense and began indicating that First Solar was already very close to grid parity. *Id.* ¶ 107. For example, on May 17, 2011, First Solar's vice president of investor relations told investors that First Solar was close to achieving the goals set forth in the Grid Parity Roadmap. *Id.* ¶ 108. Plaintiffs allege that on August 4, 2011, Gillette stated that "[o]ur [Levelized Cost of Energy ("LCOE")] is approaching grid parity, which should drive elasticity and demand and a growth of sustainable markets." *Id.* ¶ 109. But due to excessive costs associated with building the large scale solar farms, heat degradation and defects in the panels, "runaway balance of system costs," and other costs, Defendants knew they were not close to achieving grid parity. *Id.* ¶ 110. According to CW 7, the employees did not think that First Solar would achieve grid parity by 2014, but the CEO kept insisting it would happen. *Id.* ¶ 112; *see also* ¶¶ 114-16 (confidential witnesses who agree that First Solar was not close to reaching grid parity). Defendants continued to assure investors that First Solar was on track to achieve the goals in the Grid Parity Roadmap through November 2011. *Id.* ¶¶ 117, 215. On December 14, 2011, First Solar revealed that to reach grid parity it would have to slash its profit margins. *Id.* ¶ 118.

Plaintiffs allege that First Solar manipulated its CpW metric to appear close to grid parity. *Id.* ¶ 83. Defendants repeatedly told investors that First Solar's "low cost per watt manufacturing and technology was 'significantly less than those of traditional crystalline silicon solar module manufacturer' [which] enabled First Solar to 'maintain [its] cost advantage over traditional crystalline silicon solar module manufacturers.'" *Id.* In February 2010, a whistleblower complained that the vice president of financial planning told a group of his subordinates what the publicly reported CpW number should be. *Id.* ¶ 86. The vice president then directed attendees of the meeting to "do what was necessary to come up with that number." *Id.* The confidential witness brought the complaint to Meyerhoff. *Id.* ¶ 87. Plaintiffs allege that there are other witnesses who know about First Solar's manipulation of the CpW, but they are unwilling to discuss such matters because of signed confidentiality agreements. *Id.* ¶ 89.

Plaintiffs allege that, by ignoring defect issues, First Solar failed to properly account for the true costs associated with their modules, in violation of GAAP. *Id.* ¶ 129. First Solar violated GAAP when it made materially false and misleading statements regarding revenues and modules sold in hot climates. *Id.* First Solar materially understated warranty reserves and related liabilities in violation of GAAP, and First Solar failed to make required disclosures regarding the extent of the costs the company would ultimately incur. *Id.* ¶¶130-31.

## 2. Defendants' Specific False Statements.

Based on the above general allegations, Plaintiffs allege the falsity of a numerous public statements made by Defendants. Plaintiffs allege that these statements were misleading and false because they minimized the impact of the manufacturing excursion, overstated how close First Solar was to achieving grid parity, and omitted any discussion of the solar plant cost overruns and heat degradation issues. *Id.* ¶ 185.

Plaintiffs allege that during a conference call on October 28, 2010, in which Gillette, Meyerhoff, and Sohn participated, Gillette concealed First Solar's cost overruns and heat degradation problems by stating that construction on the Cimarron and Copper Mountain solar projects was progressing well. *Id.* ¶¶ 147, 149. Sohn also falsely reassured investors that the manufacturing excursion was under control. *Id.* ¶ 150. On November 1, 2010, First Solar filed a third quarter Form 10-Q, signed by Zhu, in which Defendants falsely reassured investors that they were reducing CpW. *Id.* ¶ 153.

On December 8, 2010, Gillette informed investors at the Barclays Capital Global Technology Conference that First Solar was making great progress toward lowering its per-module cost and achieving grid parity. *Id.* ¶ 157. On December 14, 2010, First Solar hosted a conference call in which Gillette, Meyerhoff, and Sohn reassured investors that First Solar was on track to achieve the goals on the Grid Parity Roadmap by the end of 2014. *Id.* ¶ 162. Gillette also told investors that First Solar completed the farm at Copper Mountain without disclosing the myriad serious problems reported by CW 7. *Id.* ¶ 163;

*see also* ¶ 92 (CW 7 reported that Copper Mountain costs 21.23% higher than forecasted).

In a February 24, 2011 conference call discussing the overall 2010 earnings, Gillette stated that First Solar was ahead of target in achieving the 2014 grid parity goals. *Id*. ¶ 170. Zhu falsely reassured investors that First Solar concluded the excursion claims process as well. *Id*. ¶ 177. Defendants also misleadingly told investors that the solar projects had been finished at Cimarron and Copper Mountain without telling them that the facilities were not producing electricity as guaranteed. *Id*. ¶ 178. Defendants' Form 10K, released on February 28, 2011, contained the same information. *Id*. ¶ 28.

Plaintiffs make similar allegations regarding Defendants' earnings reports for the first and second quarters of 2011, released on May 3, 2011 and August 4, 2011, respectively. *See id*. ¶¶ 186-91, 197-205. Plaintiffs allege that the securities filings released on May 4, 2011 and August 5, 2011 contained false statements regarding the manufacturing excursion as well. *Id*. ¶¶ 192-94, 208-11.

During a May 17, 2011 conference, a representative from First Solar stated that the company was very close to reaching its goal to achieve grid parity. *Id*. ¶ 108. On August 8, 2011, the same representative stated that First Solar was on track to exceed its Grid Parity Roadmap goals. *See id*. ¶ 212. On September 13, 2011, Plaintiffs met with Gillette, who similarly assured Plaintiffs that First Solar was on track to achieve grid parity, and that the projects in the southwest would drive profits despite cheap imports from China. *Id*. ¶ 216. Defendants again stated that First Solar was close to achieving grid parity in a November 3, 2011 conference call to discuss third quarter earnings. *Id*. ¶ 220.

Plaintiffs allege that during this November 3, 2011 conference call, Widmar stated that First Solar spent an additional $22.1 million in additional manufacturing excursion costs, but that First Solar had substantially concluded the remediation programs associated with the manufacturing excursion. *Id*. ¶ 221.

Plaintiffs allege that at the end of 2010 and throughout 2011, Defendants falsely assured investors that First Solar set conservative earnings targets and was on target to achieve 2011 guidance. Doc. 1 ¶ 120. Plaintiffs allege that Defendants' earnings forecasts intentionally or recklessly ignored First Solar's issues, including (1) "rampant defects and panel degradation that would erode customer goodwill and drive massive charges to earnings"; (2) "cost metrics that were not as good as publicly reported"; (3) "building and permitting issues resulting from known defects"; and (4) "First Solar's financial statements did not comply with GAAP." *Id*. Plaintiffs also allege, despite warnings from First Solar's employees, that Defendants repeatedly failed to consider the "glut of panels worldwide as solar panel manufacturers ramped up production." *Id*. ¶¶ 122-25 (confidential witness sixteen ("CW 16") stated that he sat in meetings with several senior level executives who refused to adjust earnings targets to take into account the worldwide oversupply of panels in the market).

In light of these allegations, the Court concludes that Plaintiffs have pled false or misleading statements with particularity in relation to defective solar panels, the manufacturing excursion, the CpW metric, profitability of the solar power plants, and progress in achieving grid parity. Plaintiffs have pled numerous incidents of specific statements Defendants made through presentations, conference calls, and security filings that falsely represented First Solar's financial condition, progress towards grid parity, profitability of large-scale solar power farms, CpW metric, and losses related to the manufacturing excursion and defective panels. Plaintiffs have identified several witnesses who allege personal knowledge of Defendants' awareness and concealment of defects in the panels and the extent of the manufacturing excursion. Plaintiffs have pled that Defendants were ignoring the solar power farms' underperformance, have identified at least one witness who reports that the CpW was manipulated, and have sufficiently demonstrated how this information affected Defendants' statements regarding grid parity and its financial condition.

### 3.  Forward-Looking Statements.

Defendants argue that many of these statements are inactionable forward-looking statements.  *See* Doc. 17 at 11.  Under some circumstances, the PSLRA's safe harbor exempts forward-looking statements, including statements regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) assumptions underlying or related to any of these issues. *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (internal citation and quotation omitted).  The forward-looking statement must be "identified as a forward-looking statement and [must] be accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A).  In the alternative, the forward looking statement is exempt from liability if the plaintiff fails to prove that a person or officer of a business made the forward-looking statement with actual knowledge that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B).

Defendants' statements do not qualify for the safe harbor under either of these prongs.  Plaintiffs allege that Defendants made all of these statements with actual knowledge that the statements were false and misleading.  Additionally, the statements do not qualify for the safe harbor to the extent they are statements of current or past facts, combined with a forward-looking statement.  *See In re Quality Sys, Inc. Sec. Litigation*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("[T]he safe harbor is [not] designed to protect [Defendants] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.").  Plaintiffs allege that Defendants misrepresented their current condition as it related to earnings and achieving grid parity.  *See, e.g.*, Doc. 1 ¶¶ 170, 199, 200, 201, 202.  Thus, the non-forward looking portion of the statement would not be covered under the safe harbor.

To the extent that challenged statements are forward looking, they also are not covered by the safe harbor because they did not include the cautionary language

mentioned in § 78u-5. Defendants argue that the forward-looking statements were accompanied by "meaningful cautionary language in First Solar's SEC filings, press releases and earnings announcements." Doc. 17 at 12. But Defendants provide only one citation to a 10K filing referenced in the complaint. *See* Doc. 17 at 10 (citing Doc. 1701 at 21 ("February 28, 2011 SEC filing")); *see also Metzler Inv. GMBH*, 540 F.3d at 1061 (review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice). The Court also finds similar language in First Solar's December 14, 2011 call transcript and First Solar's 2011 earning guidance. *See* Doc. 17-1 at 166, 171. Thus, the Court will considers the cautionary language only in those forward-looking statements. *See In re Atossa Genetics Inc. Sec. Litigation*, 868 F.3d 784, 798 (9th Cir. 2017) ("[T]he language bespeaking caution [must] relate directly to that to which plaintiffs claim to have been misled." (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).

Cautionary language must be sufficient "such that reasonable minds could not disagree that the challenged statements were not misleading." *In re Atossa*, 868 F.3d at 798. Here, the relevant provision of the SEC filing provided that the "solar energy market is at a relatively early stage of development, and the extent to which solar modules will be widely adopted is uncertain." Doc. 17-1 at 21. The language identifies many factors that could affect solar demand or First Solar's ability to sustain profitability, such as: (1) cost effectiveness of the electricity generated by PV systems compared to conventional energy sources and products; (2) "availability, substance, and magnitude of government subsides, incentives, and renewable portfolio standards to accelerate the solar industry"; (3) performance and reliability of PRV systems and thin-film technology; (4) fluctuations in economic and market conditions; and (5) fluctuations in capital expenditures by solar users. *See* Doc. 17-1 at 21-22. Other releases contain language that warn investors that forward-looking statements were not guarantees of future performance and could be affected by competitive factors and outside risks. *See* Doc. 17-1 at 166, 171.

This language is not directly related to Plaintiffs' allegations. The language in the SEC filing relates to the "adoption of solar technology"; it does not relate to the performance and quality of First Solar panels or its grid parity goals. The language referring to the performance and reliability of the PV systems and thin-film technology only mentions the comparison with conventional, non-solar technology. *See* Doc. 17-1 at 21. It does not address First Solar's unique challenges. Further, the cautionary language in the other documents is too broad to be considered related to Plaintiffs' specific allegations. *See In Re Atossa*, 868 F.3d at 798 (language is too vague and broad to cover investors' specific concerns).

### 4. Vague Inactionable Statements of Optimism.

Defendants contend that the statements are vague and inactionable expressions of optimism. Doc. 17 at 12. Statements categorized as "mere corporate puffery" or "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are not actionable because "professional investors and most amateur investors as well know how to devalue the optimism of corporate executives." *Police Ret. Sys.*, 759 F.3d at 1060. The Court must consider the context of the statements when determining if they are actionable. *Warshar v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

Plaintiffs' allegations are not "hopeful, hedged generalities." Doc. 17 at 6. Plaintiffs allege that Defendants provided specific metrics and inaccurate figures for the extent of solar panel defects, the profitability of solar power farms, and progression toward grid parity. *See, e.g.*, Doc. 1 ¶ 199. Further, to the extent Defendants knew of statements' falsity or tendency to mislead, they are actionable. *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995) (company officials made actionable statements that the company's expansion of its retail warehouse operations was successful and the expansion increased the company's prospects for earnings when they knew the expansion failed). Thus, Defendants' statement that the solar farms were "progressing very well" is actionable if Defendants knew the solar farms were not progressing well, as Plaintiffs allege. Similarly, statements that First Solar was nearing grid parity are actionable where

Defendants knew it was not. *See Warshar*, 74 F.3d at 959 (statements that "everything [was] going fine" with FDA approval, when the officer knew the treatment may not receive FDA approval, could form the basis for a securities fraud claim).

Even assuming that portions of the statements identified by Defendants are inactionable, the complaint has only one count alleging violations of § 10(b). Therefore, the Court need only find that some of the claims within that count are sufficiently plead to deny the motion to dismiss. *See Smilovits v. First Solar, Inc.*, No. CV-12-00555-PHX-DGC, 2012 WL 6574410, at *4 (D. Ariz. Dec. 17, 2012).

The Court finds that Plaintiffs have sufficiently pled falsity to survive a motion to dismiss. The Court will deny Defendants' motion on this ground.

### B. Loss Causation.

To state a claim under PSLRA the Plaintiff must show a causal connection between the material misrepresentation and the loss. *See Dura Pharams., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Loss causation is a "context dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." *Mineworkers' Pension Scheme v. First Solar, Inc*., 881 F.3d 750, 753 (9th Cir. 2018) (internal citation and quotation marks omitted). Loss causation is a proximate cause test. "[T]he ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210-11 (9th Cir. 2016)). "A plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). Thus, proof of loss causation is not confined to a particular kind of market disclosure. *Smilovits*, 119 F. Supp. 3d at 989; *see also In re Daou*, 411 F.3d at 1006 (loss causation was adequately pled where disclosures showed the company's true financial condition).

Plaintiffs allege that Defendants revealed their fraudulent scheme through eight corrective disclosures between August 17, 2011 and February 28, 2012. Doc. 1 ¶¶ 244-67. Drops in First Solar's stock value followed each disclosure. *Id*.

On August 17, 2011, First Solar announced its former CFO, Meyerhoff, was leaving. Doc. 1 at ¶ 251. Plaintiffs allege that after this disclosure stock traded down as investors voiced concerns the departure was due to hidden problems. *Id*. Meyerhoff was instrumental in developing and pushing the Grid Parity Roadmap (Doc. 1 ¶¶ 21, 103, 174), personally dealt with heat-degradation issues (*id*. ¶ 55), and handled whistleblower investigations (*id*. ¶ 85). Doc 20 at 14.

On September 16, 2011, Axiom Capital reported that First Solar issued misleading financial results and used aggressive accounting to make the company's financial results look better than they really were. *Id*. ¶ 252. After this release, First Solar's share price dropped almost five and a half percent. *Id*. ¶ 254.

On September 22, 2011, First Solar issued a press release that its Topaz Solar Farm project would not receive federal loan guarantees. *Id*. ¶ 255. Plaintiffs allege that federal regulators would not approve loan guarantees because they learned that First Solar's other plants came in well over budget (*see* Doc. 1 ¶ 92), First Solar's other plants were delayed (*id*. ¶ 99), and First Solar's other plants struggled with energy output problems (*id*. ¶¶ 55-61). Doc. 20 at 15. After this release, First Solar's share price dropped fifteen and a half percent as investors again questioned First Solar's business model. Doc. 1 ¶ 255.

On September 28, 2011, Cantor Fitzgerald warned investors that First Solar's stock price would fall because of an oversupply of panels worldwide. *Id*. ¶ 256. Share price dropped another ten percent. *Id*. Plaintiffs allege that Defendants knew about this oversupply glut but refused to revise their earnings. Doc. 1 at ¶¶ 120-27.

On October 25, 2011, First Solar announced that it replaced CEO Gillette with Ahearn on an interim basis. *Id*. ¶ 257. Press reports stated that it was a troubling sign for

the industry and for the profitability of First Solar. *Id.* The share price dropped over twenty-five percent. *Id.*

On December 14, 2011, First Solar issued a press release with updated 2011 financial guidance, forecasting a reduction in net sales, share value, and operating income. *Id.* ¶ 260. First Solar also disclosed facts sufficient for Plaintiffs and others to discern that First Solar was not on track to reach grid parity. *Id.* ¶ 261. First Solar revealed for the first time that to reach grid parity it would have to slash operating margins and price its systems far below what it originally reported. *Id.*

On February 10, 2012, First Solar shares declined again in reaction to the delay of construction of the Antelope Valley Solar Ranch. *Id.* ¶ 264. Plaintiffs allege this happened because the inspectors were concerned about the panels' performance in high heat environments. Doc. 21 at 16; *see also* Doc. 1 ¶¶ 73-74.

On February 28, 2012, First Solar stated that the excursion had a much larger impact on First Solar's financials than previously indicated. *Id.* ¶ 266. It announced a net loss of $413 million for the fourth quarter of 2011 and a loss of $39.5 million for the year. *Id.* ¶ 265. It admitted heat degradation problems, reported a $37.8 million charge for heat degradation issues, and increased its costs for excursion-related expenses by $125.8 million to $215.7 million. *Id.* First Solar indicated that the additional warranty expenses occurred in the fourth quarter of 2011. *Id.* ¶ 267.

Plaintiffs have sufficiently pled loss causation. Plaintiffs claim that Defendants engaged in a scheme to mislead investors with respect to (1) known defects in solar panels; (2) panel degradation rates, including heat degradation; (3) First Solar's cost per watt to generate electricity; (4) massive cost overruns at First Solar's utility scale projects affecting the profitability of those projects; (5) First Solar's efforts to achieve gird parity; and (6) the impact of these matters and oversupply of cheap panels on First Solar's current and future earnings. Doc. 1 ¶ 242. Defendants' statements concealed First Solar's true financial circumstances and future business prospects, resulting in Plaintiffs' purchase of artificially inflated stock. *Id.* ¶ 246.

Defendants seek dismissal of the entire complaint, not dismissal of specific allegations in the complaint. Because there is only one count in the complaint alleging violations of § 10(b), the Court need only find that some of the claims within that count are sufficiently pled to deny the motion to dismiss. *See Smilovits*, No. CV-12-00555-PHX-DGC, 2012 WL 6574410, at *4. The Court finds that the disclosures related to Defendants' share prices and accounting schemes, delays at the solar farms, ability to obtain grid parity, panel defects, and company earnings all sufficiently show loss causation. These disclosures are casually related to Defendants' fraudulent scheme and misrepresentations. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (holding that stock prices that dropped because of poor financial statements were causally related to fraudulent accounting practices that allegedly inflated earnings in previous financial statements). Further, many of the disclosures revealed Defendants' true financial condition, which led to a decline in stock value and Plaintiffs' ultimate loss. *See id.* at 1027 (complaint survives a motion to dismiss where a steep drop in stock price followed the revelation of company's true financial situation). The Court will deny Defendants' motion on this basis.

## C.    Scienter.

Defendants argue that Plaintiffs failed to plead particularized allegations concerning Defendants' scienter. Doc. 17 at 15. For Rule 10b-5 claims, the Supreme Court has defined scienter as the "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Ninth Circuit requires that "intent to deceive" be alleged "in great detail, [by] facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. A court must first determine whether any single allegation is "sufficient to create a strong inference of scienter; [and] second, if no

individual allegation is sufficient," must conduct "a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

Plaintiffs base their allegations of scienter on the confidential witness statements; a meeting between Eaglesham, E-Staff, and the Board of Directors, in which they acknowledged that the modules were degrading at a rate of eleven percent in hot climates; and insider sales. *See* Doc. 20 at 11-14.

### 1. Confidential Witnesses.

Defendants argue that the confidential witnesses do not demonstrate scienter because there is no confidential witness that had personal knowledge of the Defendants' states of mind. *See* Doc. 17 at 16. Defendants misapply the test.

Where a plaintiff relies on statements by confidential witnesses, the complaint must clear two hurdles: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *See In re Quality Sys, Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (citing *Zucco Partners, LLC, v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)). "To determine whether the complaint has done so, we look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia.'" *Zucco Partners, LLC*, 552 F.3d 981 at 995 (quoting *In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Second, statements reported by confidential witnesses with "sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id*. (*Zucco Partners, LLC*, 552 F.3d at 995).

Plaintiffs sufficiently plead the reliability and personal knowledge of each confidential witness. Throughout the complaint, Plaintiffs indicate the role the confidential witnesses served for First Solar, how the confidential witnesses received

information about the company, and often who the confidential witnesses worked under or reported to. *See In re Daou*, 411 F.3d at 1016. Plaintiffs also allege facts that the confidential witnesses, based on their position descriptions, were positioned to know. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech. Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (particularized allegations that witnesses had actual access to the disputed information raises a strong inference of scienter); *In Re Quality Sys. Inc. Sec. Litig.*, 865 F.3d at 1145; *but see Zucco Partners, LLC,* 552 F.3d at 996 (providing sufficient descriptions of confidential witnesses, but statements too broad and conclusory to plead scienter).

For example, Plaintiffs allege that CW 5 knew that First Solar's solar power farms were not producing the promised wattage, and high-level executives knew that the farms were underperforming. To support this allegation, Plaintiffs assert that CW 5 worked as a development engineer who compiled data that streamed from First Solar's solar farms, and that the collected data included energy output. Doc. 1 ¶ 60. In September 2010, at the request of First Solar executives, CW 5 flew to the company's headquarters to present this information. *Id*. ¶ 63. Plaintiffs also allege that CW 2 provided information that several individual Defendants were personally and regularly involved in First Solar's efforts to deal with heat-related problems at the El Dorado solar farm. Doc 1 ¶¶ 55-57. Plaintiffs support this allegation by pleading that CW 2 worked for First Solar as an engineer then as an operations and maintenance global manager from June 2008 to June 2012. *Id*. ¶ 37. CW 2's job was to monitor and maintain the functionality of First Solar's solar farms. *Id*.

Plaintiffs further allege that First Solar's executives were aware that the panels were underperforming at the solar plants. *See* Doc. 1 ¶ 72. Plaintiffs cite statements made by CW 8, an operations manager that oversaw the commissioning and guaranteeing of First Solar's power plants. *Id*. ¶ 71. CW 8 reported that First Solar's senior executives received regular reports about the problems in his department, including underperforming panels and heat degradation at the large scale solar projects. *Id*.

Plaintiffs allege that to deal with the degradation issues, First Solar constructed additional rows or sections of solar panels at its solar farms. *Id.* ¶ 80. Plaintiffs cite CW 11, a project manager in the engineering, procurement, and construction ("EPC") division, who managed three different solar farms. *Id.* ¶ 77.

Plaintiffs allege that degradation and defects in the panels significantly increased the costs of the panels compared to other panels on the market. *Id.* ¶¶ 67-69. But Defendants repeatedly told investors that their technology cost "significantly less than traditional models," which enabled First Solar to "maintain [its] cost advantage over [traditional] modules." Doc. 1 ¶ 83. Plaintiffs allege that Defendants were able to make this claim because they manipulated the CpW metric. *See id.* ¶¶ 83-85. Plaintiffs cite to statements by CW 13, a director of internal audit from 2006 through 2010, to support this statement. *Id.* ¶ 85. CW 13 was responsible for reviewing and acting on internal whistleblower complaints. *Id.* Plaintiffs allege that CW 13 received a whistleblower complaint, from a direct report, that the vice president of financial planning told his subordinates to "do what was necessary" to conform the actual CpW to the publicly reported CpW. *Id.* ¶ 86.

Plaintiffs allege that the CEO of the company knew about the solar utility cost overruns, and that First Solar's estimate profit margins were not feasible. *Id.* ¶ 96. CW 7 worked as a cost estimator in the EPC performance optimization unit of First Solar. *Id.* ¶ 91. CW 7's final forecasts demonstrating significant cost overruns were shared with the leadership of the EPC division, and CW 7 believes this report was also shared with the CEO. *Id.* ¶ 92. According to CW 7, First Solar bid for projects based on the Continued Cost Reduction Roadmap ("the CCRR") that set out costs for every different component of constructing a solar farm. *Id.* ¶ 93. The CCRR was approved by the senior management, and never reflected the true costs for building the projects. *Id.* CW 7 notes that leadership in the EPC division regularly argued with the CEO about the costs of the projects and the expectations on the CCRR. *Id.* ¶ 96. CW 7 reported that "[they] were told not to share [this] info with anyone outside of [First Solar]." *Id.* ¶ 97.

Plaintiffs allege that the Defendants knew the rate of defective panels was much higher than the four percent rate reported in financial reports. Doc. 20 at 11. According to CW 2 and CW 3, a quality technician at First Solar's Perrysburg plant from 2007 to 2011, and CW 4, a production operator at First Solar's Perrysburg plant from 2008 to 2012, plants were given quotas for how many units should be produced and details for what constituted a defective unit. Doc. 1 ¶¶ 40, 45-46. CW 4 witnessed supervisors regularly ignoring defective modules and sending them to customers. *Id*. ¶ 48. CW 4 reports that the defective module numbers were entered into the computer system which management could use to run reports regarding shift quota numbers. *Id*. ¶ 49. CW 2 generated reports on defective panels and sent them through the chain of comment to Gillette, Ahearn, and Sohn. *Id*. ¶ 38. Plaintiffs also cite confidential witness interviews in the class action, where a witness reported to managers that the defect rate would be twelve to fourteen percent.[2] *Id*. ¶ 50. According to the witness, the four percent failure rate released to the public was made up. *Id*.

These allegations are sufficient to create an inference that Defendants intended to deceive, manipulate, or defraud that is "at least as compelling as any counter inference." *Tellabs,* 551 U.S. at 324. Plaintiffs claim that misreporting the extent of the defective panels and heat degradation issues caused First Solar's financial reports to be inaccurate because they did not reflect the true costs of the modules, and the confidential witness statements indicate the Defendants knew about these problems prior to reporting them. *See* Doc. 1 ¶ 129-30. Further, the statements indicate that Defendants knew their representations about grid parity were false and misleading. Doc. 1 at 12. Plaintiffs have alleged sufficient facts to show that the confidential witnesses knew the information they provided, and the confidential witness statements are indicative of scienter. *In Re Quality Sys. Inc. Sec. Litig.*, 865 F.3d at 1145.

/ / /

---

[2] *See Smilovits*, No. CV-12-00555-PHX-DGC, 2012 WL 6574410, at *3.

|    |                                                                                     |
|----|-------------------------------------------------------------------------------------|
| 1  | **2.    April 2011 Meeting.**                                                       |
| 2  | The Court also takes judicial notice of the fact that Defendants met in April 2011  |
| 3  | to discuss the hot climate degradation rate and how it would affect First Solar's   |

**2.    April 2011 Meeting.**

The Court also takes judicial notice of the fact that Defendants met in April 2011 to discuss the hot climate degradation rate and how it would affect First Solar's financials. *Smilovits*, 119 F. Supp. 3d at 1006-08 ("In April 2011, Eaglesham reported his findings to E-Staff, which concluded that the hot climate degradation issue could have a financial impact of up to $60 million. At that point, all Individual Defendants knew the problem was significant."); *see also Tellabs*, 551 U.S. at 323 (the Court may take judicial notice of facts when evaluating whether Plaintiffs have sufficiently plead a federal securities claim).

Taken collectively, the confidential witness statements and the fact of the April 2011 meeting "give rise to a strong inference of scienter." *Tellabs,* 551 U.S. at 324. The Court need not address Plaintiffs' allegations regarding Defendants' stock sales because the confidential witness statements and evidence of the meeting between Defendants regarding the heat degradation of the panels is sufficiently detailed to allege scienter for the single § 10(b) count in the complaint.

**III.    Plaintiffs' Claims Against Eaglesham and Sohn.**

Defendants argue that claims against Eaglesham, First Solar's vice president of technology from June 2006 to November 2009 and chief technology officer from November 2009 to May 2012, should be dismissed. Doc. 17 at 17. Plaintiffs mention Eaglesham only with respect to his presentation on the Grid Parity Roadmap at First Solar's annual investor meeting. *Id*. Defendants argue that Plaintiffs fail to allege any statements made by Eaglesham that were materially false or misleading, and that Plaintiffs fail to allege that Eaglesham made any other statements or had ultimate authority over any of the other challenged statements. Doc. 17 at 17. Defendants further argue that none of Eaglesham's statements were made in connection with Plaintiffs' purchase or sale of securities. *Id*.

Defendants make the same arguments regarding Sohn, First Solar's president of operations until 2011. *Id*. at 18. Defendants argue that Plaintiffs' only allegation

regarding Sohn is that he presented on "Sustainability, Module Cost and Systems" at the June 24, 2009 annual investor meeting. *Id*. Plaintiffs do not allege that any of his statements were materially false or misleading or made "in connection with" the purchase or sale of securities.

Plaintiffs allege that Eaglesham and Sohn introduced the Grid Parity Roadmap and then sold stock at artificially inflated prices in 2010 and 2011 before First Solar disclosed that it would not achieve grid parity. Doc. 1 ¶¶ 23-24; Doc. 20 at 19. Plaintiffs also allege that Sohn received reports regarding defective panels. *Id*. ¶ 38. And Sohn participated in the third quarter 2010 financial results call on October 28, 2010, during which he reassured investors that Defendants "expect to continue to be on the cost-per-watt roadmap over the longer term." *Id*. ¶¶ 147-48 (alternations omitted). Sohn also participated in the December 14, 2010 conference call. *Id*. ¶ 161. The Court also takes judicial notice of Eaglesham's participation in the April 2011 meeting, discussing the heat degradation costs. *Smilovits*, 119 F. Supp. 3d at 1006-08.

Taking Plaintiffs allegations as true, Plaintiffs have alleged enough facts to suggest that Sohn and Eaglesham participated in the misrepresentations that ultimately caused Plaintiff's losses. The Court will not dismiss the claims against Eaglesham and Sohn.

**IV. Plaintiffs' § 20(a) Claim.**

Defendants argue that because Plaintiffs failed to state a claim under § 10(b) their claim under § 20(a) necessarily fails as well. Doc. 17 at 18. In the alternative, Defendants argue that Plaintiffs' § 20(a) claim fail because Plaintiffs did not allege any particularized facts showing that any individual defendant exercised actual power or control over the other Defendants or statements not attributed to them. *Id*.

Under § 20(a), individual Defendants, as controlling persons, would be jointly and severally liable for Rule 10(b) violations. 15 U.S.C. § 78t(a); *Oregon Pub. Emp. Trust Fund*, 774 F.3d at 610. "To establish a cause of action under [Section 20(a)], a plaintiff must first prove a primary violation of . . . Section 10(b) or Rule 10b-5, and then show

the defendant exercised actual power over the primary violation." *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014).

Plaintiffs plead that Defendants' individual liability, and controlling person liability, arise from the following facts: "[1] each was a high-level executive and/or director . . . ; [2] each, by virtue of his responsibilities and activities as a senior executive officer and/or director . . . was privy to and participated in the creation, development and reporting of [First Solar's] financial performance, projections and/or reports; and [4] each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading." Doc. 1 ¶ 279. Plaintiffs further allege that "because of their positions with the Company, [the individual Defendants] possessed the power and authority to control the contents of First Solar's publicly disseminated information." *Id.* ¶ 280.

Plaintiffs have sufficiently pled individual control for purposes of the § 20(a) claim. Plaintiffs provide detailed allegations of Defendants' involvement in the decision-making processes that led to the allegedly fraudulent behavior. *See e.g.*, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987)) ("day-to-day oversight of company operations and involvement in the financial statements at issue were sufficient to presume control over the transactions giving rise to the alleged securities violation"); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092-SC 2002 WL (989478 (N.D. Cal. Apr. 2, 2002) ("The Court finds that the allegations that the Individual Defendants held the highest offices in the corporation, spoke frequently on its behalf, and made key decisions in how to present its financial results are sufficient to survive Defendants' contention that the complaint lacks specificity as to control person liability."). At this stage in the litigation, these allegations are sufficient. *See Howard v. Everex Sys, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

/ / /

/ / /

/ / /

1    **IV.    Plaintiffs State Law Claims**

2         **A.    Plaintiffs State-Law Securities Claims.**

3         Defendants argue that Plaintiffs' claims under the Arizona securities fraud statute

4    are time-barred because Plaintiffs were on notice of their claim no later than February 28,

5    2012, the date of the last alleged corrective disclosure.  Doc. 17 at 18.  "[T]he statute of

6    limitations defense . . . may be raised by a motion to dismiss . . . [i]f the running of the

7    statute is apparent on the face of the complaint."  *Jablon v. Dean Witter & Co.*, 614 F.2d

8    677, 682 (9th Cir. 1980).  But even if the relevant dates alleged in the complaint are

9    beyond the statutory period, the "'complaint cannot be dismissed unless it appears

10   beyond doubt that the plaintiff can prove no set of facts that would establish the

11   timeliness of the claim.'"  *Hernandez v. City of El Monte*, 138 F.3d 393, 402 (9th Cir.

12   1998) (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir.

13   1995)); *see Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993).  Indeed,

14   "[d]ismissal on statute of limitations grounds can be granted pursuant to Fed. R. Civ.

15   P. 12(b)(6) 'only if the assertions of the complaint, read with the required liberality,

16   would not permit the plaintiff to prove that the statute was tolled'" or otherwise

17   inapplicable.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999) (citing *Vaughan v.*

18   *Grijalva*, 927 F.2d 476, 478 (9th Cir. 1991) (quoting *Jablon*, 614 F.2d at 682)); *see*

19   *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996).

20        Actions for violations of A.R.S. § 44-1991 and § 44-1999(B) must commence

21   within "two years after discovery of the fraudulent practice on which the liability is

22   based, or after the discovery should have been made by the exercise of reasonable

23   diligence."  A.R.S. § 44-2004(B).  The statute of limitations begins to run when a party

24   suspects the other party's fraudulent conduct.  *Aaron v. Fromkin*, 994 P.2d 1039, 1043

25   (Ariz. Ct. App 2000).

26        Contrary to Defendants' arguments, it is not clear from the face of the complaint

27   when Plaintiffs discovered or should have discovered the fraudulent practices underlying

28   their state law claims.  The corrective disclosures identified in Plaintiffs' complaint

helped Plaintiffs better understand First Solar's true financial situation, but the disclosures did not reveal that Defendants withheld information or acted fraudulently. The discovery of facts that put a plaintiff on inquiry notice may be useful in determining when a reasonably diligent plaintiff should have been prompted to begin investigating, but it does not automatically begin the running of the limitations period. *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1205 (9th Cir. 2011) (citing *Merck & Co., v. Reynolds*, 559 U.S. 633, 648 (2010) (interpreting federal securities law)); *St Lukes Health Sys. v. State, Dep't of Law, Civil Rights Div.*, 884 P.2d 259, 263 (Ariz. Ct. App. 1994) (where Arizona law does not resolve the issue, we will consider federal case law).

Defendants assert that under the Arizona discovery rule, Plaintiffs have the burden to explain why they did not discover the violation within the limitations period. Doc. 21 at 16 (citing *Bresser v. Metna Grp.*, 934 F. Supp. 2d 1150, 1158 (D. Ariz. 2013). The Court disagrees. Under Arizona law, the burden shifts to the party opposing a motion to dismiss only after the moving party first demonstrates that the claim is barred. *See Anson v. Am. Motor Corp.*, 747 P.2d 581, 582 (Ariz. Ct. App. 1987); *see also Burr v. Inland Drilling Co.*, 883 F.2d 1023(Table) (9th Cir. 1989) (under Arizona law, statute of limitations is an affirmative defense and the burden to prove an affirmative defense is on the defendant). Shifting the burden to Plaintiffs does occur until the Defendants have shown the claim should be barred based on the face of the complaint, which they have not. The Court will not grant Defendants' motion on this basis.

### B. Plaintiffs' Common Law Fraud Claim.

Defendants argue that Plaintiffs fail to state a claim for common-law fraud under Arizona law because they failed to describe individualized fraudulent conduct attributable to each Defendant pursuant to Rule 9(b). Doc. 17 at 20. Additionally, Defendants argue that Plaintiffs fail to adequately plead loss causation and scienter. *Id*.

To prevail under a claim for common law fraud in Arizona, Plaintiffs must allege:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent

- 28 -

that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury.

*Echols v. Beauty Built Homes, Inc.*, 647 P.2d 629, 631 (Ariz. 1982). Under Rule 9(b), a plaintiff must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distr. Co. v. ServWell Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *see also Vess v. Ciba-Gigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged."). In a fraud suit "involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'requires plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." (internal citation and quotations omitted)).

Plaintiffs argue that they have satisfied their burden because they have individually alleged Defendants' fraudulent conduct, participation in conference calls, and involvement in First Solar's security filings. Doc. 20 at 17. The Court agrees. Plaintiffs have pled the role each Defendant served at First Solar and how each Defendant may have benefited from an artificially inflated stock price. *See* Doc. 1 ¶¶ 18-25. In their detailed complaint of over 300 paragraphs, Plaintiffs allege incidents connected to each Defendant regarding participation in conference calls, meetings, or presentations where misrepresentations were made, and instances where Defendants learned of truthful material but failed to notify the public. *See, e.g.*, Doc. 1 ¶¶ 38, 39, 55, 103, 180, 219, 220, 257. Because the Court finds above that Plaintiff have sufficiently pled loss causation and scienter, the Court will not these address Defendants' argument in relation

to Plaintiffs' common law fraud claim.  The Court will deny Defendant's motion on this basis.

### C.    Plaintiffs' Negligent Misrepresentation Claim.

Defendants argue that Plaintiffs have failed to plead a special relationship as required for negligent misrepresentation.  Doc. 17 at 21.  Under New York law, a negligent misrepresentation claim must contain the following elements:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation as known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  A "special relationship" requires a greater degree of trust than between an "ordinary buyer and seller."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003).

Whether a special relationship exists is an issue of fact governed by three factors: (1) whether the person making a representation "held or appeared to hold unique or special expertise"; (2) whether a "special relationship of trust or confidence existed between the parties"; (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 102-03 (2d. Cir. 2001) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (1996)).

An ordinary relationship between a business and members of the public who purchased its stock does not qualify as a special relationship.  *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 388 (S.D. N.Y. 2011); *see also Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp.2d 651, 674 (S.D.N.Y. 2011); *Barron Partners, LP v. Lab 123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009) (no special relationship where the parties were simply the buyer and seller of corporate stock).  But there are circumstances where a relationship extends beyond a "typical arm's

length business transaction." *Suez Equity Investors, L.P.*, 250 F.3d at 103-04 (special relationship where "defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information."); *Kimmell*, 675 N.E. 2d at 454-55 (special relationship where defendants sought out plaintiffs and provided them with financial projections that failed to account for a new regulation that would make defendants' projections economically impractical).

Defendants argue that Plaintiffs fail to show a relationship beyond a typical corporation and its shareholders. Plaintiffs counter that Defendants possessed unique or specialized expertise because Defendants had access to information that Plaintiffs did not, Defendants were able to evaluate the data in a way that Plaintiffs could not, and this data induced Plaintiffs to purchase First Solar Stock. Doc. 20 at 18. But unique or specialized expertise is only one factor necessary to demonstrate a special relationship, and it will almost always exist when the knowledge of corporate officers is compared to the knowledge of corporate shareholders. Plaintiffs must also show that Plaintiffs and Defendants shared a special relationship of confidence and trust.

Plaintiffs' allegations are based on Defendants' legal duty to all shareholders, not on a special or unique relationship. Doc. 1 ¶¶ 313-16. Plaintiffs allege they relied on statements and publications issued for all shareholders when making purchases of First Solar stock. *See, e.g.*, Doc. 1 ¶ 145. Plaintiffs allege numerous communications, meetings, and phone calls (*id.* ¶ 239), but identify only one individual meeting with Defendants, where Defendants reassured Plaintiff of First Solar's projections and expectations after an investors' conference (¶ 215). Plaintiffs fail to allege any facts that demonstrate this meeting included an exchange of information distinct from the public exchanges and indicative of a special trust or confidence between the parties. The Court finds that Plaintiffs' allegations are insufficient to demonstrate a special relationship, and will dismiss the negligent misrepresentation claim.

/ / /

**D.    Failure to State a Claim under Arizona Securities Law.**

Defendants argue that because Plaintiffs did not adequately state a claim under § 10(b), Plaintiffs' state securities law claims should also fail. Doc. 17 at 22. Defendants also argue that Plaintiffs have failed to show a direct tie between the fraudulent sale and the Defendants' actions. *Id*. at 22-23. Defendants argue that Plaintiffs have not sufficiently stated a claim for violation of A.R.S. § 44-1991(A)(3) because they did not adequately allege a "deceptive scheme beyond misrepresentations and omissions." *Id*. at 23. Finally, Defendants argue that Plaintiffs' claim for § 44-1999(B) "control-person liability" should be dismissed because Plaintiffs fail to plead a primary violation of § 44-1991. *Id*.

In Arizona, "it is unlawful for a person, in connection with a transaction or transactions . . . offering to sell or buy securities . . . to . . . [m]ake any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." A.R.S. § 44-1991(A)(2). Section 44-1991 also provides that it is unlawful for any person to "[e]ngage in any transaction, practice or course of business which operates or would operate as fraud or deceit." § 44-1991(A)(3). Arizona's securities law provides the Attorney General with a range of public enforcement measures. *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 333 n.6 (Ariz. Ct. App. 1996). But the legislature provided a private right of action only against individuals who "made, participated in or induced the unlawful sale or purchase." A.R.S. § 44-2003(A). "No person shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase." *Id*. To be liable under § 44-1991(A)(2)-(3), a defendant must do more than "merely provide information that contributes to a buyer or seller's decision to close the deal." *Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 333 (Ariz. Ct. App. 1996).

The Arizona Supreme Court has held that a claim can stand where defendants had direct contact with plaintiffs for the purposes of selling stock. *See Grand v. Nacchio*, 236 P.3d 398, 403 (Ariz. 2010) ("[T]hrough their acts and omissions the defendant encouraged the Trust to buy stock from others in the aftermarket. This is classic inducement."); *see also Strom v. Black*, 22 Ariz. App. 102, 104 (Ct. App. 1974) (finding inducement and participation where the defendants placed ads for the securities and showed misleading financial statements to potential purchasers). By contrast, where defendants' misleading statements were not directly given to stock purchasers and the defendants had no additional contact with the purchasers, the claim fails. *See In re Allstate Ins. Litig.*, 971 F. Supp. 2d 930, 943 (D. Ariz. 2013).

The Court finds Defendants' alleged conduct most like the conduct in *Strom* and *Grand*. Plaintiffs' allegations center around Defendants' misrepresentations and omissions at investor meetings, shareholder conference calls, and other platforms designed to inform shareholders of First Solar's value and expected performance. *See, e.g.*, Doc. 1 ¶¶ 103, 108, 151, 153, 156, 157, 162, 165. Unlike the misleading statements in *Allstate*, these statements were designed to maintain and encourage investment. Further, on at least one occasion, Defendants met with Plaintiffs to encourage them to continue investing in First Solar. *See* Doc. 1 ¶ 215. Plaintiffs also allege that Defendants' directly contacted them to encourage investment over one hundred times. Doc. 20 at 18; Doc. 1 ¶ 239.[3] Thus, the Court finds that Plaintiffs have adequately pled that Defendants made, induced, or participated in Plaintiffs' stock purchase. *Grand*, 236 P.3d at 401-02 (courts need not parse whether the a person violating A.R.S. § 44-1991(A)(3) "made," "participated in," or "induced" the lawful sale).

Defendants cite to *Red River Resources, Inc. v. Mariner Systems, Inc.*, No-CV-11-02589-PHX-FJM, 2012 WL 2507517, at *10 (D. Ariz. June 29, 2012), to argue that

---

[3] These communications demonstrate that Defendants encouraged investment, but they are insufficient to establish a special relationship for the purpose of negligent misrepresentation because Plaintiffs do not allege any exchange of information beyond that given to every similarly situated shareholder.

Plaintiffs have not sufficiently stated a claim because they did not allege "a deceptive scheme beyond misrepresentations and omissions." Doc. 17 at 23. *Red River* involved claims under A.R.S. § 44-1991(A)(1), which states that it is unlawful for a person to "employ any device, scheme, or artifice to defraud" in connection with a transaction to buy or sell securities. *See* No-CV-11-02589-PHX-FJM, 2012 WL 2507517, at *10; *see also* A.R.S. § 44-1991(A)(1). Plaintiffs assert a securities claim under A.R.S. § 44-1991(A)(2) and (3), neither of which require a "device, scheme or artifice to defraud." Thus, the Court finds Defendants' argument inapposite.

To the extent that subsection three requires manipulative conduct that operates as fraud, distinct from actions or omissions, Plaintiffs have alleged sufficient facts. *See Red River*, 2012 WL 2507517, at *10. Plaintiffs allege that Defendants engaged in a "transaction, practice or course of business which operates or would operate as fraud or deceit." *See* Doc. 1 ¶¶269-74. Plaintiffs provided numerous allegations, which if taken as true, show concealment with the intent to mislead regarding panel defects, the extent of the manufacturing excursion, the profitability of the solar power plants, and the ability to achieve grid parity.

Plaintiffs have sufficiently pled a claim under A.R.S. § 44-1991. In light of this conclusion, the Court will also deny Defendants' motion to dismiss Plaintiffs' claim for control-person liability under § 44-1999(B).

**V.    Leave to Amend**.

Plaintiffs seek leave to amend their complaint in the event the Court grants Defendants' motion. Doc. 20 at 19. "Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

The Court concludes that Plaintiffs' request to amend should be granted so Plaintiffs may amend their negligent misrepresentation claim. The Court has seen no evidence to suggest that Plaintiffs have acted in bad faith or that Defendants will be

prejudiced by the amendment. As an amended complaint could sufficiently plead negligent misrepresentation, the claim is also not futile.

**IT IS ORDERED:**

1.      Defendants' motion to dismiss (Doc. 17) is **granted as to Plaintiffs claim for negligent misrepresentation and denied as to the rest of the claims.**

2.      Plaintiff's request to amend is **granted**.  Plaintiffs shall file an amended complaint on or before **December 11, 2018**.

Dated this 27th day of November, 2018.

David G. Campbell
Senior United States District Judge